Estate of W. Favre Slater, deceased, Charles G. Black, Administrator v. Commissioner. Estate of Florence R. Slater, deceased, Charles G. Black, Administrator and Estate of W. Favre Slater, deceased, Charles G. Black, Administrator v. Commissioner. W. F. Slater Engineering Corporation v. Commissioner.
Estate of Slater v. Commissioner
Docket Nos. 35077, 35078, 35079.
United States Tax Court
T.C. Memo 1962-256; 1962 Tax Ct. Memo LEXIS 50; 21 T.C.M. (CCH) 1355; T.C.M. (RIA) 62256; October 31, 1962
Charles H. Davis, Esq., for the petitioners. George L. Hudspeth, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax, declared value excess-profits tax, excess profits tax, and additions to tax as follows: Docket No. 35077.
Estate of W. Favre Slater, Dec'd
Income Tax
Additions Under
Year
Deficiency
Sec. 293(b) *
1944
$18,775.22
$ 9,387.61
1945
7,796.05
4,072.62
1946
28,702.10
14,605.24
1947
22,477.58
11,238.79
1949
5,051.91
2,525.96
Docket No. 35078, Estate of Florence R. Slater,
Dec'd and Estate of W. Favre Slater, Dec'd
1948
$12,006.90
$ 6,003.45
Docket No. 35079,
W. F. Slater Engineering Corporation
INCOME TAX
1944
$ 3,213.63
$ 1,606.82
1945
3,091.99
1,546.00
1946
23,320.66
11,660.33
1947
[929.89] **
2,291.12
1948
5,019.26
8,398.49
DECLARED VALUE EXCESS-PROFITS TAX
1944
$ 1,600.60
$ 800.30
1945
976.54
488.27
EXCESS PROFITS TAX
1944
$12,221.24
$ 9,165.93
1945
3,398.06
2,548.55
*52 The three cases were consolidated for hearing and opinion. Some of the issues raised by the pleadings have been conceded by the petitioners either at the trial or on brief; the issues remaining for decision are: 1. Whether amounts claimed by the petitioner W. F. Slater Engineering Corporation (hereinafter called the corporation) as operating expense deductions in the years 1944, 1947, and 1948 were nondeductible capital expenditures; 2. Whether certain amounts claimed as deductions by the corporation for the years 1944 through 1948 represented nondeductible expenditures for the personal benefit of decedent W. Favre Slater (hereinafter called Slater); 3. Whether the corporation improperly deducted, in the years 1944 through 1948, various other amounts claimed as operating expenses; 4. Whether the corporation failed to report various amounts of sales for the years 1944 *53 through 1948, inclusive; 5. Whether the corporation is liable for additions to tax under section 291(a) of the Internal Revenue Code of 1939 for failure to file excess profits tax returns for the years 1944 and 1945; 6. Whether Slater, for the years 1944 through 1949 (he and his wife for the year 1948) improperly claimed amounts as charitable contributions; 7. Whether he, for the years 1944 and 1947, and he and his wife for 1948, are entitled to medical expense deductions, and if so the amount thereof; 8. Whether Slater's reported taxable income for the years 1944 through 1948 should be increased by amounts determined by the respondent to be unexplained deposits to banks or investment accounts; 9. Whether Slater improperly deducted on his individual returns for the years 1944 through 1947 amounts claimed as automobile mileage expense; 10. Whether Slater for the years 1944 through 1949 improperly deducted amounts claimed for entertainment and sales promotion expenses; 11. Whether Slater in each of the years 1944 through 1949 received unreported constructive or informal dividends from the corporation; 12. Whether Slater realized additional income of $4,896.75 in 1946 *54 as a commission received for selling certain property; 13. Whether Slater is entitled to an exemption for his wife Florence for the years 1946 and 1947; 14. Whether the statute of limitations bars assessment and collection of income tax deficiencies asserted against Slater for the years 1944 and 1945 and of income tax and declared value excess-profits tax deficiencies asserted against the corporation for those years; and 15. Whether some part of the deficiency involved in each of the three cases was due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. W. Favre Slater resided in Memphis, Tennessee, prior to his death on February 1, 1959. He filed individual income tax returns for the taxable years 1944, 1945, 1946, 1947, and 1949 with the collector of internal revenue, Nashville, Tennessee. The returns for 1944 and 1945 were filed on March 15, 1945 and February 20, 1946, respectively. Florence R. Slater died on November 16, 1948 after a long illness lasting six to eight years during which she was confined to her bed at home. After her death her husband filed a joint return and amended *55 return for the year 1948, signed by him both individually and as administrator of her estate. Petitioner W. F. Slater Engineering Corporation, organized under the laws of the State of Tennessee on May 29, 1934, had its main office in Memphis, Tennessee, and a branch office in Little Rock, Arkansas. In Memphis it occupied premises at 627 Monroe Avenue, which was owned by Slater and which was leased from him. During the years in question, the corporation kept its books and reported its income on an accrual method of accounting and a calendar year basis. It filed income and declared value excess-profits tax returns for 1944 and 1945 and income tax returns for the years 1946 through 1949, with the collector of internal revenue, Nashville, Tennessee. The returns for 1944 and 1945 were filed on March 15, 1945 and February 20, 1946, respectively. It did not file excess profits tax returns for the years 1944 and 1945. When organized in 1934 the corporation had authorized capital stock of $25,000 represented by 1,000 shares of common stock with a par value of $25 per share. As of January 1, 1944, the corporation's outstanding stock was held as follows: Slater, 720 shares; Florence Slater, *56 78 shares; and Alex T. Bevil, 2 shares. In 1946 the authorized capital stock was increased and after March 27, 1947, the outstanding stock was held as follows: Slater 3,908 shares; Florence Slater, 78 shares; and Bevil, 14 shares. During the years in question and prior thereto the corporation was engaged primarily in the business of selling, installing, and servicing commercial type air conditioning units, room air conditioning units, food freezers, unit heaters, and walk-in refrigerators. It was the distributor for a well known brand of air conditioners in the trade territory comprised of Western Tennessee, Northern Mississippi, and all of Arkansas. During all of the years in question, Slater was the president, chief administrative officer, and principal stockholder of the corporation; Florence was vice president and a minority stockholder until the time of her death. Alex T. Bevil was an employee of the corporation from 1934 until 1949 except for a period from 1940 through 1942. In 1938 he received two shares of stock in the corporation and in 1942 he was made secretary. Sometime prior to March 27, 1947, he was given 12 additional shares. He was the chief engineer of the corporation. *57 He was concerned mostly with estimating, buying, and supervising installations; he was not concerned with the financial affairs of the corporation. During the years in question, the corporation's office staff was comprised of two or three engineers, a bookkeeper and one or two secretaries. It employed service and installation personnel varying in number from eight or ten to thirty or forty. Slater held a degree in mechanical engineering. He was in full charge of the affairs of the corporation and supervised the business in detail. He supervised individual jobs and inspected materials, hired employees for installation jobs, and considered proposals for future jobs. He kept a close tab on the financial affairs of the corporation and on the bookkeeping. At meetings of the board of directors of the corporation it was Slater's practice to indicate what he wanted done and his directions were carried out. Although he did delegate authority to others in the corporation, he would rarely allow them to carry out the assigned work and would generally take over the work himself. Slater reserved to himself the full authority to sign checks for the corporation, except payroll checks, and did *58 in fact sign about 90 percent of all corporate checks. All such checks were prepared by the bookkeeper, Dean, except some which were drawn by Slater when he was traveling within his trade area in order to obtain funds to pay wages of local labor and defray other costs incurred in connection with installations. Dean would usually know nothing about these checks until they were returned cancelled from the bank at the end of the month. At that time he would ask Slater about the expenditures and would charge the amounts of the checks to such accounts as were indicated by Slater. William H. Dean, who had been an accountant since about 1932, began working for the corporation as head bookkeeper and office manager in June 1943 and remained with the corporation until about April 1952 when he was discharged by Slater because he refused to agree to testify, as Slater wanted him to do, contrary to his understanding of the facts. Dean kept all of the corporate records, made bank deposits for the corporation, and signed the payroll checks which were also countersigned by either Slater or his wife. In keeping the corporate books Dean was closely supervised by Slater and made various entries and *59 alterations in the records at the direction of Slater, as will be pointed out in detail hereinafter. Slater did not keep personal records, nor did Dean keep any such records for him. Dean made most of the deposits to Slater's bank accounts for Slater. Dean prepared all the corporate income tax returns for the years 1944 through 1949, deriving his information from the corporate records. Such returns were shown to Slater who signed them as president of the corporation. Dean also prepared the personal income tax returns for Slater. In preparing such personal returns he derived some information from the books of the corporation and some from his personal knowledge. Slater furnished him a list of all deductions. If he needed further information he obtained it from Slater. Dean and Slater generally prepared the personal returns together. On March 21, 1949, a revenue agent, Luther A. Fahr, began an examination of the corporation's books and records. At the direction of Slater he dealt with the bookkeeper, Dean. As the examination progressed the agent concluded that it was necessary to examine the returns of Slater, and a special agent, J. A. Spann, was called into the case in June *60 1949. Spann worked with the agent until the completion of the examination. Spann died in 1953. The agent spent from 25 to 40 days at the offices of the corporation and thereafter took the records to the Internal Revenue office for further examination. He completed his investigations and filed his reports in August 1950. During his investigation there were made available to the agent records of the corporation including the general ledger, the general journals for the years 1944 through 1949, and the subsidiary ledgers containing accounts receivable, accounts payable, and work in process for those years. The agent asked for the invoices and paid bills of the corporation and these were furnished to him, but with respect to many of the deduction items with which he was concerned there were no such paid bills or invoices or any documents in the files. In such instances he inquired of the bookkeeper as to the nature of the payments and in most instances he could obtain no information. He then checked outside sources and attempted to locate the other parties to the transactions. In many instances he found that the records of such third parties had been destroyed. Nevertheless, if such *61 third party could confirm the transaction, whether or not by records, the revenue agent took no exception to the entries. In cases where the items could not be verified they were disallowed. The items disallowed were unusual and nonrecurring. With respect to hundreds of items that were charged as expenses the payees were persons or firms with which the corporation did business regularly, and none of such items were questioned or disallowed by the agent. The bank statements and cancelled checks of the corporation for the years 1946 through 1949 were made available to the agent. For the years 1944 and 1945 such statements and checks had been destroyed. On several occasions the agent asked Slater for the cancelled checks, bank statements, and duplicate deposit tickets with respect to all his personal bank accounts and the bank accounts of his wife. Although Slater promised to make them available, he finally advised the agent that he did not keep those records and that they had been destroyed. When the agent was unable to obtain any personal checks from Slater or his wife, he went to the various banks and obtained copies or made transcripts of the various records maintained by the banks, *62 consisting of deposit tickets, ledger sheets, and films of checks drawn against these accounts. On the books of the corporation Slater had a personal account, described in more detail infra. The agent made a detailed analysis of this account. As a result of the revenue agent's investigation the respondent determined against the corporation the deficiencies and additions to tax on account of fraud as above set forth, as well as the deficiencies and additions to tax on account of fraud against the individuals as also set forth above. Also as a result of the examination, criminal proceedings were instituted against Slater in the United States District Court for the Middle District of Tennessee for violation of section 145(b) of the Internal Revenue Code of 1939 in willfully attempting to defeat and evade Federal income tax for the calendar years 1947 and 1948. After a plea of not guilty, Slater was convicted on May 5, 1956, and was sentenced to serve eight months in prison for his conviction as to 1948 and two months for his conviction as to 1947, and to pay fines totaling $1,000. The prison sentences were suspended and Slater was placed on probation. The decision and order as to *63 the criminal convictions became final and no appeal was taken. In its income tax returns for the taxable years 1944 through 1948 the corporation reported gross sales, gross income, net income or (loss), and income tax liability as follows: Net Income
Income Tax
Gross Sales
Gross Income
or (Loss)
Liability
1944
$123,521.25
$ 59,316.53
($ 820.86)
1945
174,123.70
51,890.11
(1,703.59)
1946
411,929.01
114,220.52
5,935.95
$1,383.98
1947
595,589.04
151,388.50
4,043.03
929.89
1948
648,624.34
155,426.37
(34,899.87)
The corporation did not report any declared value excess-profits tax due for either of the years 1944 or 1945. In the notice of deficiency mailed to the corporation on March 15, 1951, the respondent, in determining the deficiencies in income tax of the corporation for each of the years 1944 through 1948 and in excess profits tax and declared value excess-profits tax for the years 1944 and 1945, computed the corporation's net income (before carryback to 1947 and 1948 of a net operating loss for 1949, discussed infra under "Inventory Adjustments") to be as follows: 1944
1945
1946
1947
1948
$28,200.46
$16,773.04
$65,439.83
$24,048.48
$45,926.62
*64 In arriving at such amounts of net income the respondent made, among others, the following adjustments: 1944
1945
1946
1947
1948
Unallowable
deductions and addi-
tional income
Excessive
$ 14.07 *
$ 420.33 *
$ 409.01 *
depreciation
Long-term capital
449.72 *
1,250.00 *
1,925.00 *
$ 157.62 *
gains
Capital expenditures
charged to
expense
4,282.59
667.49 *
3,656.78
2,054.10
Personal items of
Mrs. Slater
charged to expense
573.54 *
$ 195.30 *
332.79 *
1,380.12 *
Personal items of W.
F. Slater
charged to expense
10,337.38
11,379.36
33,826.23
21,845.37
19,383.17 **
Other unallowable or
unsubstan-
tiated deductions
8,272.77
6,331.46
5,181.28
3,414.75
4,257.42
Sales understated
5,457.09
577.00
590.45
4,609.74
444.00
Inventory adjustment
17,235.31
54,700.00
Total
$29,387.16
$18,483.12
$59,503.88
$37,240.77
$80,996.31
The following tabulation shows the aggregate amounts *65 of cost of goods sold and expenses claimed by the corporation for each of the years 1944 through 1948, the aggregate amounts thereof disallowed by the respondent, and the respondent's characterization of the items disallowed: Aggregate Amounts
Aggregate Amounts
Claimed
Disallowed
Cost of
Cost of
Year
Goods Sold
Expenses
Goods Sold
Expenses
1944
$ 65,138.29
$ 60,137.39
$11,975.93
$11,490.35
1945
130,280.91
53,593.70
4,287.26
13,618.86
1946
328,644.71
108,284.57
23,817.40
16,190.39
1947
412,404.25
147,345.48
16,461.36
13,835.66
1948
519,979.77
191,226.24
6,246.10
19,448.59
Characterization of Items
Disallowed
Other
Unallowable
Slater and
Capital
or Unsub-
Year
Wife
items
stantiated
Personal
1944
$10,910.92
$4,282.59
$8,272.77
1945
11,574.66
0
6,331.46
1946
34,159.02
667.49
5,181.28
1947
23,225.49
3,656.78
3,414.75
1948
19,383.17
2,054.10
4,257.42
In his individual income tax returns for the years 1944 through 1947, inclusive, and 1949, and in the joint income tax return for Florence and himself for 1948, Slater reported income *66 and claimed deductions as follows (amended returns for 1947 and 1948): Income
1944
1945
1946
1947
1948
1949
Salary - W. F.
Slater
Engineering
Corp.
$7,500.00
$7,500.00
$7,500.00
$7,500.00
$10,000.00
$ 7,500.00
Dividends and
994.00
1,546.12
1,185.64
4,073.80
Interest
Farm Income
(157.84)
(148.02)
(99.51)
(Loss)
Capital Gains
(425.37)
(365.99)
and (Losses)
Rental Income
3,953.57
(Net)
Interest on
2,065.80
Stocks & Bonds
Total Income
$7,342.16
$8,345.98
$8,521.24
$8,319.65
$14,073.80
$13,519.37
Contributions
$ 425.00
$ 550.00
$ 490.00
$ 595.00
$ 595.00
$ 875.00
Interest
63.74
63.74
Taxes
329.79
420.40
420.40
420.40
499.71
470.53
Allowable
197.89
1,743.90
3,236.41
Medical
expenses
Depreciation
843.00
843.00
on car
Automobile
1,300.00
1,750.00
2,100.00
2,220.00
mileage
Sales
Promotion,
travel &
entertain-
ment
600.00
960.00
750.00
750.00
398.50
600.00
Total
$2,852.68
$3,744.14
$3,824.14
$5,729.30
$ 5,572.62
$ 2,788.53
Deductions
NET INCOME
$4,489.48
$4,601.84
$4,697.10
$2,590.35
$ 8,501.18
$10,730.84
TAX LIABILITY
$ 737.44
$ 766.06
$ 630.19
$ 207.17
$ 993.94
$ 2,252.59
*67 In the notice of deficiency (mailed on March 15, 1951 in both Docket Nos. 35077 and 35078) the respondent, in determining the deficiencies in income tax against Slater for the years 1944 to 1949, inclusive (Slater and his wife for 1948), computed the net income to be as follows: 1944
$35,536.50
1945
22,756.42
1946
57,121.62
1947
48,107.15
1948
42,332.95
1949
23,098.74 In arriving at such amounts of net income the respondent made, among others, the following adjustments: 1944
1945
1946
Unallowable deductions and ad-
ditional income
Contributions
$ 425.00
$ 550.00
$ 490.00
Taxes
84.63 *
76.89 *
Medical Expenses
197.89
Unexplained Bank Deposits
15,599.08
1,999.17
4,139.39
Farm Rental Income
555.23 *
391.98 *
438.85 *
Automobile mileage expense
1,300.00
1,750.00
2,100.00
Entertainment & Promotion
expense
600.00
960.00
750.00
Interest Received
278.83 *
239.14 *
Capital gains
2,039.78 *
Constructive dividends
13,513.92
9,155.76
35,417.23
Other dividends
1,016.00 *
Interest paid
63.74 *
63.74 *
Salary
300.00 *
Other Rental Income
2,667.90 *
3,955.66 *
Capital loss
425.37 *
Commissions
4,896.75
Other income
Automobile depreciation
Total
$35,610.36
$18,154.58
$52,676.99
*68 1947
1948
1949
Unallowable deductions and ad-
ditional income
Contributions
$ 595.00
$ 595.00
$ 875.00
Taxes
134.93 *
75.60 *
Medical Expenses
1,440.03
Unexplained Bank Deposits
12,570.75
3,214.66
8,153.70
Farm Rental Income
Automobile mileage expense
2,220.00
Entertainment & Promotion
expense
750.00
398.50
600.00
Interest Received
23.90 *
324.24 *
14.00 *
Capital gains
4,111.31 *
151.50 *
Constructive dividends
17,673.84
19,827.17
1,200.66
Other dividends
50.00 *
Interest paid
Salary
385.70 *
Other Rental Income
5,742.34 *
6,638.71 *
884.55 *
Capital loss
Commissions
Other income
12.57 *
Automobile depreciation
843.00 *
843.00 *
Total
$43,872.07
$33,894.11
$12,583.48
Facts with respect to items adjusted by the respondent are set forth in the order in which they appear in the above tabulations. The Corporation Long-Term Capital Gains The long-term capital gains, all of which are conceded by the corporation, were determined by the respondent to be as follows: *69 $449.72 from the sale of two trucks in 1944; $1,250 from the sale of a 1941 Buick automobile in 1946; $1,925 from the sale of certain automobiles and trucks in 1947; and $157.62 from the sale of a motor scooter and a jeep in 1948. The amount of $1,250 had been included by the corporation in reported sales for 1946, and the respondent as a part of his determination eliminated it therefrom. Included in the amount of $1,925 for 1947 was an amount of $1,400, the net sales price for a 1942 Buick automobile sold by the corporation. The check in payment therefor was deposited by Slater in his personal account at the Union Planters National Bank & Trust Co. Neither the corporation nor Slater reported this sale in their returns for 1947. The respondent included this amount as an unreported long-term capital gain of the corporation and treated it as a distribution to Slater. Capital Expenditures Charged to Expense The respondent determined that the amount of $4,282.59 expended by the corporation in 1944 constituted capital expenditures for the building of offices in the building which it leased from Slater. The corporation had treated this amount as deductible cost of repairs to the *70 building. This amount was composed of a large number of items, including purchases of supplies and amounts paid to a contractor. They were all made in connection with constructing offices in the leased building which the corporation occupied and making other improvements to such building. The respondent determined that the amount of $667.49 deducted by the corporation in 1946 as an expense was the cost of a hydraulic lift gate for a truck and a soft drink dispenser. The corporation has conceded that this amount of $667.49 constituted capital expenditures. The respondent determined that the amount of $3,656.78 deducted by the corporation in 1947 as expense constituted the cost of a new front to the leased building ($2,440.73), part of the cost of an automobile ($628.95), light fixtures ($50.60), an office call system ($243.77) a filing cabinet ( $60), two electric drills ($114.73) and a skill saw ( $118). Of these expenditures, the corporation concedes that $628.95 expended for the automobile was a capital expenditure. The respondent determined that the amount of $2,054.10 deducted by the petitioner in 1948 was made up of the cost of constructing new offices in a leased building *71 in Little Rock, Arkansas ($1,707.31), the cost of light fixtures ($42.99), and furniture and fixtures written off on the books e8$303.80). The respondent restored the item of $303.80 to the petitioner's depreciable assets account. The respondent allowed depreciation on all of the above items determined by him to be capital expenditures for each year. Personal Items of Mrs. Slater Charged to Expense The corporation paid to or on behalf of Mrs. Slater personal items as follows: 12 items totaling $573.54 for 1944, 9 items totaling $195.30 for 1945, 12 items totaling 1945, 12 items totaling $332.79 for 1946, and 16 items totaling $1,380.12 for 1947. These amounts were claimed by the corporation as deductions, but were disallowed by the respondent. For the year 1948 the respondent held that there were items which should be disallowed because they constituted personal expenditures for or on behalf of Mrs. Slater; they are not segregated but are included with similar items determined to be payments on behalf of Slater, the total for both for that year being $19,383.17. Personal Items of Slater (and Mrs. Slater for 1948) Charged to Expense The respondent disallowed as deductions *72 to the corporation, as being personal items of Slater paid by the corporation, about 200 items totaling $10,337.38 for 1944, about 150 items totaling $11,379.36 for 1945, about 200 items totaling $33,826.23 for 1946, and about 235 items totaling $21,845.37 for 1947. He disallowed as deductions, as being personal items of both Slater and his wife for 1948, about 374 items totaling $19,383.17. He determined that all these amounts constituted distributions to Slater (Slater and his wife for 1948). The individual items were paid for a great variety of purposes. Included were expenditures for doctor, nurse, hospital and ambulance bills, school tuition, decorating and repairing Slater's residence, life insurance premiums on Slater's life, taxes on Slater's property, clothing and jewelry, food and cigarettes, automobile expenses, utility bills for Slater's residence, for stock and other property for Slater, and for other purposes. In many instances the books themselves clearly showed that items were expended by the corporation for the benefit of Slater or his family. The revenue agent did not always accept these as conclusive, but often obtained information from third parties to substantiate *73 that the items were of a personal character. These various expenditures were charged on the corporate books to various expense and inventory accounts having, in many cases, no apparent connection with the character of the item. It was Slater's practice to cause the corporation to make certain payments to him or on his behalf. Many of the checks which he drew on the corporation's bank account were in payment of his or his wife's personal items or to obtain cash for his personal use. In many instances he directed the bookkeeper Dean to reflect particular personal items on the books of the corporation as expenses of the corporation, and this was done. In other instances he would have Dean reflect personal items as debits to his personal account. Dean, when not instructed by Slater, followed the practice of debiting to Slater's personal account amounts which he thought were for Slater's personal benefit. Periodically Slater would instruct Dean to reverse certain of the entries which had been entered as debits in the personal account and reflect the items as corporate business expenses. This was accomplished in the manner described hereinafter. The aggregate amounts set forth above which *74 were disallowed by the respondent for each of the years included both types of items - namely, those which had been originally directly reflected as corporate expenses on the corporate books and also those which had first been treated as debits to Slater's personal account on the books and later, at the direction of Slater, removed from the personal account and reflected as corporate expenses. The following are examples of personal items which Dean, at the instruction of Slater, charged directly to corporate expense: Corporate ac-
Date
Amount
Payee
Purpose
count charged
5/18/44
$100.00
Dr. Friedman
Personal, dental bill
General expense
6/ 7/44
69.00
Dr. Friedman
Personal, dental bill
Advertising
3/10/45
65.00
Dr. Stern
Personal, doctor bill
Purchases
3/10/45
144.85
Pentecost-Garrison
School
Tuition, Slater's son
Purchases
9/ 4/46
50.00
Webb School
Tuition, Slater's son
Office expense
9/24/46
26.23
Clarence E. Head
Shirts for Slater
Travel and enter-
tainment
10/ 5/46
43.00
Dr. Friedman
Personal, dental bill
General expense
4/21/47
35.50
Methodist Hosp.
For Mrs. Slater
General expense
7/31/47
56.00
Mrs. Jackson
Nursing fee
Travel and enter-
tainment
8/22/47
200.00
MCM Co.
Residence driveway
Inventory
11/20/47
80.00
Sherwood Costen
Dog
Inventory
12/ 7/47
500.00
Broker
Purchase stock rights
Inventory
for Slater
1/27/48
443.58
Webb School
Tuition, Slater's son
Inventory
5/15/48
370.00
Dr. Varner
Medical expense for
Inventory
Slater
8/ 4/48
125.00
Dr. Varner
Medical expense for
Inventory
Slater
9/ 1/48
150.00
Sherwood Costen
Dog, Pomeranian
Inventory
*75 As stated, some amounts which the corporation paid to or on behalf of Slater were debited to his personal account. Slater's salary from the corporation was credited to this account. On December 31, 1944, there was a credit balance of $1,819.03 in this personal account. On that date a debit entry was made to such account in the same amount with a notation "To Close Account", and a like amount was credited on the corporate books to general expense, rental expense, and advertising. This had the effect of reducing the amount of corporate expenses reflected on its books by that amount. The respondent in his determination properly took this entry into account as an offset in computing the amount of personal items taxable to Slater. As of December 31, 1945, Slater's personal account reflected a large number of items which the corporation had paid and debited to such account. Included were the following: Date
Amount
Payable to or Purpose
5/22/45
$322.20
"Credit: Eleanor Harris,
Acct. Rec."
5/22/45
24.21
"Eleanor Harris - Balance
Due"
10/ 1/45
57.00
"Phil A. Halle"
10/ 1/45
259.80
"Harry Hall - Liquor"
10/15/45
50.00
"Mrs. W. F. Slater -
Birthday Gift"
12/10/45
18.10
"Farley City Growers"
12/19/45
203.64
"Milo's Liquor"
$934.95
*76 On December 31, 1945, Dean, upon the instructions of Slater, made a credit entry to Slater's personal account in the amount of $934.95 and increased the corporate expenses shown on its books by a corresponding entry in the same amount as a debit to the corporation's travel and entertainment account. [1]
As of February 28, 1946, Slater's personal account reflected a number of items which the corporation had paid and debited to such account, including the following: Payable to or
Date
Amount
Purpose
1/ 7/46
$ 75.00
"W. W. Odom"
1/ 7/46
28.40
"A. L. Crump"
1/21/46
99.09
"W. A. Ransom Co."
$202.49 On the same date a credit entry in the same amount was made to the personal account and the corporate expenses shown on its books were increased by the same amount as a debit to the travel *77 and entertainment account. On December 31, 1946, there existed a credit balance of $880.73 in the personal account of Slater. On that date an additional credit of $21,191.93 was made to the personal account and denominated "Dr. MFS Inventory". This entry arose as a result of a transaction involving the acquisition by the corporation in 1946 of certain surplus materials from the War Assets Administration. Slater, on behalf of the corporation, purchased the assets and arranged for payment to be made by a bank loan secured by a chattel mortgage on some of the assets. The loan was repaid by the corporation. The assets which were not pledged to secure the loan were made the subject of an invoice which Slater submitted to the corporation purporting to show that such assets were sold by him to the corporation for $21,191.93. Slater personally had paid nothing for these assets; in fact, he had purchased them for the corporation and it, by repaying the bank loan, stood the full cost of the assets. Slater personally did not own any of the assets. As a consequence of the invoice submitted by Slater, the corporation credited Slater's personal account as of December 31, 1946, with the amount *78 of $21,191.93 and increased its cost of inventory by that amount. The respondent in his determination held that the corporation had already reflected the full cost of these assets and, therefore, he decreased the cost of goods sold by the amount of $21,191.93. He also held that the credit resulted in the distribution to Slater in 1946 of a taxable dividend to the extent that there were available earnings and profits. As of February 28, 1947, Slater's personal account reflected a large number of items which the corporation had paid and debited to his account, including the following: Date
Amount
Payable to or Purpose
1/ 9/47
$ 30.00
"Mrs. Archer - Nurse"
1/ 9/47
32.00
"Mrs. Jackson - Nurse"
1/ 9/47
52.91
"Marshall Field Co."
1/15/47
164.90
"Campbell Clinit"
1/15/47
405.00
"Webb School"
1/22/47
64.00
"Mrs. Jackson"
1/13/47
24.00
"Mrs. Jackson"
1/31/47
56.00
"Mrs. A. Jackson - WFS Arm"
1/31/47
25.00
"Dr. J. Terry - WFS Arm"
2/ 3/47
63.00
"Campbell Clinic"
2/28/47
59.40
"Webb School"
$976.21 On the same date a credit entry in the amount of $976.21 was made to Slater's personal account. The corporate expenses were increased in the *79 same amount by a debit entry to the corporate account for travel and entertainment. As of November 6, 1947, there were included among numerous debit entries in Slater's personal account the following: Date
Amount
Payable to or Purpose
3/ 5/47
$ 12.00
"Campbell Clinic"
4/ 4/47
383.00
"Campbell Clinic"
4/28/47
19.00
"Campbell Clinic"
4/28/47
98.50
"Methodist Hospital"
4/30/47
56.00
"A. Jackson"
5/ 6/47
56.00
"A. Jackson"
7/ 8/47
30.00
"Campbell Clinic"
8/ 4/47
56.00
"Mrs. A. Jackson"
8/14/47
158.54
"Methodist Hospital"
8/14/47
253.50
"Cr: Accounts Receivable"
8/31/47
5.07
"Cr: Accounts Receivable -
Sal Sales Tax on Unit"
10/14/47
444.34
"Cr: Accounts Receivable"
Total
$1,571.95 On the same date a credit entry of $1,571.95 was made to Slater's personal account. At the same time the same amount was reflected on the corporation's books as a cost of inventory by a debit to the account "Dr. Memphis Inventory". Despite the two above credit entries to the personal account of Slater in 1947, there remained in such account at December 31, 1947, a debit balance of $3,587.25. On that date a credit entry to such account was made *80 in the same amount, resulting in a zero balance in the account. The same amount was reflected on the corporation's books as a cost of inventory by a debit to its Memphis inventory account. It is conceded by the petitioners that the following aggregate amounts were paid by the corporation for Slater's personal benefit (either by issuing checks or crediting his account) and charged to various expense and inventory accounts of the corporation, and that they should have been properly charged to Slater personally. [2]
Purpose
1944
1945
1946
1947
1948
Doctors, nurses and
$ 292.00
$ 71.00
$ 46.00
$2,057.88
$2,934.64
hospitals
Personal expenses
151.25
178.60
51.50
1,087.85
710.25
Decorating and repairing
resi-
dence
1,361.09
466.45
275.00
Life insurance
1,048.21
806.24
1,113.82
1,611.07
Taxes
649.45
538.28
757.10
418.76
1,118.40
Clothing and jewelry
158.22
103.94
26.23
66.21
270.31
Food and cigarettes
71.50
64.74
71.35
Bassett property expense
36.50
556.55
125.00
108.79
16.03
Automobile expense
1,451.76
Utilities for residence
235.54
279.88
234.96
221.09
265.23
Misc. personal expenses and
investment
580.00
150.00
Ambulance service
130.50
Total agreed
$5,455.52
$3,000.94
$1,240.79
$5,994.14
$7,277.78
*81 Under this heading of personal items of Slater charged to expense, the respondent disallowed greater amounts spent for clothing and jewelry than petitioners have admitted are disallowable as deductions to the corporation. Among the items disallowed as deductions to the corporation and treated as distributions to Slater was $323.30 paid by corporate check to a Memphis jeweler for a 14-diamond ladies white gold watch. Slater had caused the corporation to purchase this watch for him to give as a present to his wife. This watch was charged by the corporation to its Memphis inventory account. Among the items disallowed as deductions to the corporation and treated as distributions to Slater were amounts paid by the corporation to Little Rock Club, a downtown social club in Little Rock, Arkansas. These amounted to $128.98 in 1944, $108.19 in 1945, $66.95 in 1946, $84.29 in 1947, and $117.63 in 1948. Slater used such club only for business purposes when he was in that city, such as entertaining prospective customers. The amounts in question constituted business expenses of the corporation. Among the items disallowed by the respondent as deductions to the corporation and treated as distributions *82 to Slater were numerous corporate checks drawn by Slater, while in Memphis and while traveling, to various hotels, banks, and other payees. Some of these checks were drawn by Slater for the purpose of obtaining cash to pay labor charges, to pay his traveling expenses while on corporate business, and to defray other business expenses of the corporation. Among the aggregate items disallowed by the respondent for each of the years 1944, 1945, 1946, 1947, and 1948, the amounts $900of, $350, $1,000, $1,600, and $1,200, respectively, constituted business expenses of the corporation incurred by Slater in this manner. The stipulated facts show that during the year 1944 the corporation drew checks in favor of Slater in the total amount of $450 and credited his personal account with an amount of $1,001.76 for "use of automobile". This amount totaling $1,451.76 was deducted by the corporation. The respondent disallowed this amount as a deduction and treated it as a distribution to Slater. The petitioners concede that the respondent was correct in his determination as to 1944. The stipulated facts also show that for the years 1945 and 1946 checks totaling $3,275 and $3,000, respectively, were *83 issued to him for the same purpose. These amounts had been charged to expense on the books of the corporation (principally to an account for automobile expense, but some portions were charged to advertising expense, stationery and printing, and travel and entertainment expense), and were deducted in the corporate returns. Slater did not report these amounts as income in his returns for the years 1945 and 1946. These amounts were disallowed by the respondent as corporate deductions, and treated as distributions to Slater. The corporation, during the years 1945 and 1946 made use of only three automobiles which are described below. On March 17, 1941, Slater purchased a 2-tone green Buick for his wife, which was used by or on behalf of the corporation only on rare occasions. On March 18, 1942, the corporation purchased a 1941 black Buick for $800, which was used in its business. This automobile was listed as a corporate asset in the corporation's returns for 1944 and 1945, and depreciation was taken thereon. In September 1943 Slater purchased from the Ohio Buick Company a 1942 black Buick automobile for $1,662.85. The purchase price was paid for by corporate check dated September 15, 1943. The *84 corporation also paid the amount of the license tags, $18.50, making a total cost of $1,681.45. This total amount was initially debited to Slater's personal account. However, on December 31, 1943, the personal account was credited with the same amount and such amount was charged to the automobile expense account of the corporation. The automobile was not set up as an asset on the books of the corporation and no depreciation was claimed thereon. The petitioner never did reimburse the corporation for the purchase price of the automobile. This car was sold on October 4, 1947, and the check in payment therefor in the amount of $1,400 was made out to Slater and was deposited in his personal account. This automobile was used in the business of the corporation, and also by Slater personally. During the years in question the corporation did not declare and pay formal dividends. The corporation from time to time borrowed money from the Union Planters National Bank & Trust Co. In the case of each loan the bank required the personal endorsement of Slater on the corporation's note. On December 7, 1944, the corporation borrowed $95,000 from such bank, secured by $100,000 U.S. Treasury 2% bonds, *85 which loan was repaid on December 19, 1944. At some time in 1946 there was owing by the corporation to the bank an aggregate of $37,000. In 1947 the borrowings ranged from a high of $42,000 to a low of zero. During 1948 borrowings ranged up to a high of $50,000, at which time the loan was placed on a liquidating basis and was fully paid out in 1951. On the books of the corporation there was an account denominated "W. F. Slater, Loan Account". This showed a balance in favor of Slater as of the end of each of the years 1943 through 1949, respectively, of $23,321.83, $27,371.83, $36,302.43, $5,000, $20,000, $45,000, and $10,000. The balance in the amount ranged as high as $61,000 in May 1949 and reflected a zero balance in May 1946, March 1947, July 1949, and August 1949. Unallowable or Unsubstantiated Items The items disallowed by the respondent as deductions to the corporation, as being unallowable or unsubstantiated, consisted of about 100 items totaling $8,272.77 for 1944, about 135 items totaling $6,331.46 for 1945, about 135 items totaling $5,181.28 for 1946, about 100 items totaling $3,414.75 for 1947, and about 100 items totaling $4,257.42 for 1948. The respondent did not *86 treat them as distributions to Slater or his wife. These amounts were made up principally of non-recurring items shown on the books as having been paid to concerns or persons with whom the corporation did not normally do business and as to which the revenue agent could find no invoices or paid bills or as to the character of which he could not obtain independent confirmation. In each instance the revenue agent would ask the bookkeeper, Dean, to explain the item, and if Dean could not supply the information the agent would attempt to locate the payee. If he could locate the payee and obtain confirmation he would make no adjustment even though the payee did not have records. The items disallowed represented only a portion of all the items of deduction claimed. There were hundreds of items of payments to payees with whom the corporation regularly did business as to which the respondent made no adjustments. Also included in the above amounts disallowed by the respondent were some of the amounts which the books described as having been paid to Mrs. Slater, and portions of total disbursements made from the petty cash account. A substantial portion of the disbursements made from the petty *87 cash account were not disallowed. There were no vouchers or any records available to the agent to show the purpose of any of the payments from the petty cash account. The petitioner-corporation did not pay small items, such as amounts for freight and express, from petty cash, but paid such items by check. Sales Understated The respondent determined that the corporation had unreported sales in the year 1944 in the amount of $5,457.09. He accordingly increased the corporation's income by that amount and treated such amount as a distribution to Slater. Included in the amount of the respondent's adjustment for 1944 was an amount of $4,840 received by Slater from the Northington Officers Club and Mess in payment for some used air conditioning equipment. At that time it was difficult to obtain such equipment and Slater from time to time bought this equipment as a favor to the club. The club paid him in 8 checks, representing the cost which Slater had to pay for the equipment. There was no profit to Slater upon these transactions. This was not a transaction of the corporation. Also included in respondent's adjustment for 1944 was the amount of $487 which represented the selling price *88 of a food freezer sold by the corporation to Robb & Rowley, Inc. This food freezer was purchased by the corporation, but the proceeds of the sale were deposited to Slater's bank account known as the "F & F Co." account (which account will be more particularly described infra). This amount was not reported by either the corporation or by Slater in their 1944 income tax returns. Also included in the respondent's adjustment for 1944 was an amount of $130.09, being a check drawn in favor of the corporation by another air conditioning firm in payment for the latter's infringement upon the sales territory of the corporation. Slater endorsed this check and received the proceeds therefrom. Slater did not report this amount as income in 1944. The respondent determined that the corporation had unreported sales in the year 1945 in the amount of $577. Included in this amount was $487, representing the sales price of a food freezer purchased by the corporation from Arthur Boot & Co. and sold to Eleanor Harris. The proceeds of this sale were deposited in Slater's special bank account at Union Planters National Bank & Trust Co. Slater did not report any income in his return for the year 1945 *89 on account of this transaction. The respondent held that the amount of $487 constituted a distribution to Slater. The respondent's net adjustment to the corporation's sales for 1946 was an increase of $590.45. In that year the corporation sold a gas heater to Ed Lamb for $375, the proceeds of which were received by Slater. Slater did not report any amount as income in his return for 1946 on account of this transaction. In that year Slater collected $1,000 due the corporation from sales or work done, such amount ultimately being deposited in his special account at Union Planters National Bank & Trust Co. Slater did not report this amount as income in his 1946 income tax return. In his determination for 1946 the respondent determined that the corporation had understated its sales by the amount of $1,840.45, which included the two sales just mentioned. Since the corporation had erroneously included in sales an amount of $1,250 from the sale of a 1941 Buick automobile (as referred to hereinabove under "Long-Term Capital Gains"), the respondent determined that there had been a net understatement of sales of $590.45. The respondent also held that Slater had received $1,591 as a result *90 of the diversion to himself of proceeds of sales properly belonging to the corporation, including the proceeds of the two sales just mentioned above, and that these represented distributions to Slater. The respondent determined that the corporation's sales had been understated for 1947 in the amount of $4,609.74. Included in this amount were the proceeds of the sale by the corporation of two compressors and one air conditioning unit to M. T. Gossett Company, Nashville, Tennessee, for $3,200. This amount was paid by two checks in the amount of $1,600 each, made payable to Slater at his instructions. These checks were endorsed by Slater and deposited in his account at Union Planters National Bank & Trust Co. Slater did not report this amount as income in his 1947 income tax return. This amount was included by the respondent in the amount of distributions to Slater. Inventory Adjustments In its return for the year 1946 the corporation computed the cost of goods sold as follows: Inventory at beginning of year
$ 58,105.87
Material or merchandise bought for
manufacture or sale
328,644.71
Total
$386,750.58
Less: Inventory at end of year
93,029.16
Cost of goods sold
$293,721.42
*91 Such cost of goods sold was used by the corporation in computing its gross profit from sales. The respondent in his determination increased by $17,235.31 the above item of $93,029.16, which he found to be the amount of the "Material Inventory" account at the end of the year per the books. The respondent's adjustment was explained in the notice of deficiency and in the revenue agent's report upon which such notice was based. The respondent determined that during 1945 the corporation had set up a form of perpetual inventory accounting whereby certain purchases and other items were charged to the general ledger account "Inventory"; that during the years certain credits were made to this account allegedly representing cost of inventory items sold or used for service and contract jobs; that the amounts so credited to the inventory were charged to either work in process or directly to cost of sales; that the balance in the inventory account on any particular date allegedly represented the cost of inventory on hand at such date; that on December 31, 1946, an entry was made by the corporation crediting Memphis inventory and charging Little Rock cost of sales with the amount of $17,235.31; *92 and that this was apparently an arbitrary amount used to reduce 1946 net income, since there was no record of a physical inventory being taken at December 31, 1946, to use as a basis for such an entry. The respondent, therefore, disallowed such item as a part of cost of sales for 1946 and restored such amount to material inventory as of the end of 1946 and the beginning of 1947. In its return for the year 1948 the corporation computed its cost of goods sold as follows: Inventory at beginning of year
$ 69,588.59
Material or merchandise bought for
manufacture or sale
519,979.77
Total
$589,568.36
Less: Inventory at end of year
112,535.59
Cost of goods sold
$477,032.77 Such cost of goods sold was used by the corporation in computing its gross profit from sales. The respondent in his determination increased by $54,700 the above item of $112,535.59. His adjustment was explained in the notice of deficiency and in the revenue agent's report. He determined that the material inventory shown on the corporation's books amounted to $112,535.59 on December 31, 1948; that this book inventory had not been corrected to reflect an understatement of such inventory as of *93 that date; that the understatement amounted to $54,700 as indicated by a statement furnished by the corporation to the Reconstruction Finance Corporation and to Dun & Bradstreet, Inc.; and that complete records of the physical inventory taken at December 31, 1948, were not made available to the revenue agent for examination. The respondent accordingly increased the material inventory as of the end of 1948 and the beginning of 1949 by the amount of $54,700, thereby increasing net income by that amount for 1948. The respondent's action in increasing material inventory at the close of each of the years 1946 and 1948 and decreasing opening inventory as of the beginning of 1947 and 1949, respectively, had the effect of reducing taxable income for 1947 and 1949 by the amounts of the respective adjustments. The inventory adjustment as of the beginning of 1949 resulted in increasing the net operating loss of $22,810.83, which the petitioner had reported for 1949, to $47,898.04. The respondent carried this back, first, to the taxable year 1947 and applied it to offset all the taxable income which he had determined for that year, namely, $24,048.48; the remainder ($23,849.56) of the net operating *94 loss for 1949 was allowed by the respondent as a deduction in computing net income for the taxable year 1948. An accounting firm made an audit of the corporation's books as of April 13, 1948. In the audit report it was stated that physical inventories were taken in Memphis with the assistance of the corporation's employees and that inventories were taken in Little Rock by the corporation's employees; that the physical inventory at Memphis was in excess of book inventory by $42,360.74 and that at Little Rock physical inventory was in excess of book inventory by $1,013.58. By letter dated May 26, 1948, addressed by the corporation (by Slater) to the accounting firm it was stated that the inventory of equipment and supplies located at Little Rock and that portion of the inventory at Memphis comprising small equipment and supplies which had been submitted to the accounting firm for purposes of its audit as of April 13, 1948, had been counted by the corporation's employees under management supervision and "that the inventory in its entirety was priced at cost and * * * reflects true and correct value of the merchandise on hand at that date." Slater and his Wife Contributions The *95 amount of deduction for contributions which the respondent disallowed for each of the years in question represented the full amount claimed by Slater (both Slater and his wife in their joint income tax return for the year 1948). These amounts were $425, $550, $490, $595, $595, and $875, respectively, for the years 1944 through 1949. In his returns Slater claimed these amounts as contributions to churches and various charitable or educational organizations. The amounts of deductible contributions made by Slater in the years 1944 through 1949, inclusive (petitioner and his wife for 1948), were $300, $350, $300, $300, $350, and $425, respectively. Medical Expenses In his return for the year 1944 Slater reported medical expenses incurred in the amount of $565 and claimed a deduction of $197.89 thereof under the statutory limitation. The respondent disallowed any deduction on account of medical expense for the reason that the amount of $565 did not exceed to any extent, 5 percent of the adjusted gross income as determined by the respondent. For the year 1948 Slater and his wife in their joint income tax return reported medical expenses in the amount of $3,815.71 and claimed as *96 a deduction $3,236.41 thereof under the statutory limitation. The respondent determined that there were medical expenses in the amount of $4,027.17, but determined that Slater and his wife were entitled to deduct only $1,796.38 as being the excess of medical expenses over 5 percent of adjusted gross income determined by him, and, therefore, disallowed $1,440.03 of the medical expense deduction claimed. For the taxable year 1947 Slater filed an original return on March 5, 1948, in which he did not report any medical expenditures. However, on the same date he filed an amended return for 1947 in which he reported uncompensated medical expenditures in the amount of $2,159.88 of which he claimed as a deduction $1,743.90 under the statutory limitation. In the deficiency notice for the year 1947, the respondent used as a basis for his determination the original return in which no medical deduction had been claimed, and the respondent did not allow any deduction for medical expenses. The corporation paid $2,057.88 for medical expenses for Slater and family in 1947. Unexplained Bank Deposits Slater maintained various bank accounts in his own name, including a savings account at the First *97 National Bank of Memphis, a special account at the Union Planters National Bank & Trust Co. in Memphis, and an account at the Commercial & Industrial Bank. He also had an account in the name of "F & F Co." at the Union Planters National Bank & Trust Co. against which only he was entitled to make withdrawals or write checks. He also had an investment account with the brokerage firm of Merrill, Lynch, Pierce, Fenner & Beane. Mrs.Slater also maintained a bank account at the Union Planters National Bank & Trust Co. The revenue agent went to the various banks and obtained copies or made transcripts of the various records of these accounts, consisting of deposit tickets and ledger sheets and films of checks drawn against these accounts. [3] A substantial portion of the deposits represented currency deposits as to which the agent was unable to determine the source. The deposit tickets generally showed the source of the checks deposited. The agent analyzed all the information he could obtain and in his computation eliminated all deposits which he could determine had been reported as income by Slater, or which he, the agent, had already included as income. He also eliminated from his calculation *98 transfers between bank accounts, withdrawals from the corporation and charged to Slater's personal drawing account, proceeds from loans, gifts or payments received from Slater's father and mother where they could be identified, and other items which he could determine did not represent income. As a result of his investigation, the agent treated as income certain deposits, principally currency deposits, and numerous small checks as to which he could get no information and could not identify as nontaxable receipts. The respondent determined, based upon the revenue agent's report, that the following aggregate amounts of unexplained bank deposits constituted taxable income: 1944
$15,599.08
1945
1,999.17
1946
4,139.39
1947
12,570.75
1948
3,214.66
1949
8,153.70
*99 Of the above listed amounts, the deposit slips describe the following amounts as being deposits of currency: 1944, $15,340; 1946, $3,670; 1947, $10,225; 1948, $2,850.25; and 1949, $6,258. The amount of $2,850.25 for 1948 includes currency of $920.25 deposited in Mrs. Slater's account, representing amounts received by her upon the redemption of series "E" U.S. Savings Bonds. In 1945 there was a deposit made to Slater's special account in the amount of $1,740 as to which the records did not indicate whether or not it was cash. During the years in question Slater rented a safe deposit box at the First National Bank in which he kept valuables, securities, and cash. Following the advice of his father, based upon his father's experience during the depression, Slater made it a practice to keep some cash in his safe deposit box. Slater received an undisclosed number of gifts of cash from his parents on the occasions of anniversaries or birthdays ranging from $300 to $5,000, and he also borrowed from his mother money in undisclosed amounts and at undisclosed times. Sometimes Slater deposited such funds in his bank accounts and sometimes he put them in his safe deposit box. Sometimes Slater *100 would draw cash from his safe deposit box and deposit it in his savings account or other bank accounts. During the years 1944 to 1948 Florence Slater also received an undisclosed number of gifts from her father which ranged in amount from $2,000 to $4,000. Mrs. Slater inherited between $3,000 and $4,000 from her paternal grandmother during the 1930's. The amounts determined by the respondent as unexplained deposits were made up of 116 separate deposits in varying amounts over the years 1944 through 1949. In several instances the dates of the deposits in the bank accounts correspond with dates on which Slater entered his safe deposit box. In some instances the dates of withdrawals from Slater's savings account correspond with dates on which some of the deposits in question were made to the other bank accounts. However, with one exception which will be referred to, the amounts withdrawn from the savings account did not correspond with the amounts deposited in any of the other accounts. That exception was a deposit of $5,000 made by Slater on December 7, 1944, to his account at the Union Planters National Bank & Trust Co., which the respondent determined was an unexplained deposit. *101 Slater made a withdrawal from his savings account in the amount of $5,000 on December 7, 1944. The deposit of $5,000 was made from the amount of $5,000 which Slater withdrew from his savings account. On December 7, 1944, Slater entered his safe deposit box. He had entered such box on 12 prior occasions in 1944. The records of the Bureau of Public Debt for the years 1944 to 1949, inclusive, contain no record of any United States Savings bonds registered in the name of Slater or his wife and redeemed during those years, except such bonds redeemed in 1948 for a total amount of $920.25, and they contain no record of any other United States securities registered in the name of or redeemed by Slater or his wife during such years. The revenue agent's report contains a depreciation schedule in which is listed property located at 631 Monroe Avenue, Memphis, showing the date of acquisition as being April 9, 1945, and a cost of $10,596.67. In the notice of deficiency the respondent allowed Slater depreciation on such building for 1945, but no depreciation was claimed or allowed on such property for any prior years. Automobile Mileage Expense Slater, in connection with the business *102 of the corporation, traveled by car in the corporation's trade territory during the years 1944, 1945, 1946, and 1947. He paid expenses in connection with the use of such car on such trips. In his returns for the years 1944, 1945, 1946, and 1947 Slater claimed as deductions the respective amounts of $1,300, $1,750, $2,100, and $2,200 as auto mileage computed at five cents per mile for the first two years and six cents per mile for the last two years. This was described in the returns as expense in connection with business in covering the tri-state territory. In the notice of deficiency the respondent disallowed all these claimed deductions on the ground that Slater had not shown that he was entitled to them. Entertainment and Promotion Expense During each of the years 1944 through 1949 Slater entertained various persons, by giving dinners and cocktail parties in his home, for the purpose of promoting the business of the corporation. The corporation itself also deducted substantial amounts for entertainment and promotion. At the end of each year Slater estimated the amount which he had spent during the year in this manner and deducted such estimates in his returns. The amounts *103 claimed by him as deductions were as follows: 1944
$600.00
1945
960.00
1946
750.00
1947
750.00
1948
398.00
1949
600.00
In the notice of deficiency the respondent determined that Slater was not entitled to any of the claimed deductions. Interest Received In his returns for the years 1944 and 1948 Slater did not report any interest received. For the year 1947 he reported interest received in the amount of $235.14. In his returns for the years 1945 and 1949 he reported dividends and interest combined in the respective amounts of $994.00 and $2,065.80. The respondent determined that Slater had received unreported interest in the amounts of $278.83 in 1944, $239.14 in 1945, $23.90 in 1947, $324.24 in 1948, and $14 in 1949. The petitioner concedes the correctness of the respondent's determinations. The unreported interest for the year 1944 consisted of $243.91 from United States bonds which had been deposited in Slater's savings account and $34.92 earned on his savings account and credited to such account. The respondent determined that the unreported interest for the other years was from these same sources. Capital Gains In his return for the year *104 1944 Slater did not report any capital gains. The respondent determined that Slater had long-term capital gain from the sale of property at 1963 Evelyn Avenue, Memphis, Tennessee, in the amount of $4,079.56, of which one-half or $2,039.78 was subject to tax. In his return for the year 1947 Slater reported a loss upon the sale of a farm in the amount of $365.99. In the notice of deficiency the respondent determined that there was a gain on the sale of the farm in the amount of $4,440.63, of which one-half or $2,220.32 was subject to tax. The respondent also determined that Slater had an unreported long-term capital gain of $650 on the sale of a truck, of which one-half or $325 was subject to tax, and an unreported short-term capital gain of $1,200 on the sale of an automobile, all of which was subject to tax. The respondent determined that Slater in 1948 had an unreported long-term capital gain of $418 on the sale of an automobile, of which one-half or $209 was subject to tax. He partially offset this amount by an unreported loss on the sale of certain bonds. The net addition on account of capital gains made by the respondent for 1948 was $151.50. The petitioners concede the correctness *105 of the respondent's determination of capital gains for each of the years 1944, 1947, and 1948. Constructive Dividends In the notice of deficiency the respondent determined that Slater received constructive dividends from the corporation in the taxable years 1944 through 1949 (Slater and his wife for 1948) in the respective amounts of $13,513.92, $9,155.76, $35,417.23, $17,673.84, $19,827.17, and $1,200.66. These amounts consisted of hundreds of items paid by the corporation which the respondent held were paid to or for the benefit of Slater and his family, and various amounts owing to the corporation which he held that Slater had appropriated to his own use, all as hereinabove previously referred to. The respondent had in most instances classified greater amounts as distributions by the corporation to Slater but limited the amount determined to be taxable dividends to the amounts which he determined represented for each year the amount of earnings and profits of the corporation accumulated since February 28, 1913, or earnings and profits of the taxable years. The corporation at January 1, 1944, had earnings or profits accumulated since February 28, 1913, in the amount of $2,839.66. *106 Other Dividends Slater omitted from income in his returns for 1944 and 1947 dividends which he had received from other corporations in the respective amounts of $1,016 and $50. The dividends which he received in 1944 were received with respect to stock which he owned in such corporations as General Motors Corporation, General Electric Company, Chrysler Corporation and American Telephone and Telegraph Company. The petitioner concedes that these amounts constituted taxable income to Slater. In his return for 1944 Slater had reported no dividends. In his return for 1947 he had reported dividends of $950.50. Salary In his return for 1945 Slater reported salary from the corporation in the amount of $7,500. He also received $300 of salary from the corporation which he did not report. The item of $385.70, representing salary admittedly not reported in the joint return for 1948, consisted of 14 checks of $27.55 each issued by the corporation to Florence Slater in payment of her salary as an officer of the corporation. Such amount was charged on the books of the corporation to various expense accounts other than salary account. Other Rental Income During the years 1945 through *107 1949 Slater owned two buildings - one at 627 Monroe Street, Memphis, which was rented to the corporation, and one at 631-35 Monroe Street which was rented to Hudson Sales Corporation. In his returns for the years 1945 through 1948, he did not include as income any rental received from such properties. In his return for 1949 he reported gross rental income of $4,800 and net rental of $3,953.57. In the years 1945 through 1949, he received checks in the aggregate amounts representing rental income on these properties, and had net rental income from such properties, as follows: 627 Monroe Street
631-35 Monroe Street
Total Net
Gross Rental
Net Rental
Gross Rental
Net Rental
Rental
1945
$1,547.89
$ 325.79
$3,000.00
$2,342.11
$2,667.90
1946
2,200.00
785.70
4,409.00
3,169.96
3,955.66
1947
2,700.00
1,930.42
4,775.00
3,811.92
5,742.34
1948
3,800.00
2,956.73
4,800.00
3,681.98
6,638.71
1949
2,000.00
1,196.39
4,800.00
3,641.73
4,838.12
The respondent determined that Slater had net rental income from those properties for the years 1945 through 1949, in the respective amounts of $2,667.90, $3,955.66, $5,742.34, $6,638.71, *108 and $4,838.12. In the notices of deficiency the respondent accordingly increased Slater's reported income for the years 1945 through 1949 by the respective amounts of $2,667.90, $3,955.66, $5,742.34, $6,638.71, and $884.55. In his petitions Slater did not raise any issue with respect to these adjustments. The checks written by the corporation in payment of the rent to Slater on premises 627 Monroe Street were made payable to "F & F Company". Slater would turn these checks over to Dean to deposit in Slater's "F & F Company" account at the Union Planter's National Bank & Trust Co. This account was set up by Slater for use in connection with his rental properties. Expenses in regard thereto were paid from this account. When Dean prepared Slater's income tax returns for the years 1945 through 1949, including his joint return for 1948, he told Slater that this rental income should be reported, but Slater directed him not to report it. When the revenue agent came to examine the books of the corporation, Slater told Dean not to talk to the agent about this bank account. Dean did later tell the agent about this account after the agent had inquired about it. Commissions In 1930 Mrs. *109 Lily Belle Bassett, the mother of a college classmate of Slater, who lived in California, requested Slater to assist her in recovering certain land owned by her in Harrison County, Mississippi, hereinafter referred to as the Bassett property, which had been taken over by the state for delinquent taxes. Slater sold some timber on the land, paid the taxes and recovered the land for Mrs. Bassett. On July 17, 1944, Mrs. Bassett executed a written instrument appointing Slater as her attorney in fact to care for and negotiate the sale of the Bassett property. On July 24, 1944, Slater as attorney in fact for Mrs. Bassett entered into an agreement of sale of a large part of the property with Charles B. Dudley for a price of $20,000, such contract being conditioned, however, upon the furnishing of a marketable title. Difficulty was encountered in clearing title to the property and at some later time Slater as attorney in fact for Mrs. Bassett leased such portion of the property to Dudley under a lease with an option to purchase. In a letter from Slater to Dudley dated October 28, 1944, Slater stated his understanding that if Dudley did not exercise the option to purchase, any repairs or *110 changes made by Dudley would become the property of Mrs. Bassett. On February 2, 1945, Dudley made a deposit of $2,000 in escrow with a bank under the lease-option contract. On the same date Dudley also issued a check payable to Mrs. Bassett in the amount of $600 as payment for the first year's rental of the property. This check was endorsed by Mrs. Bassett to Slater who deposited it in his personal account. After negotiations carried on by Slater as attorney in fact for Mrs. Bassett the sale to Dudley was consummated by a deed executed by Mrs. Bassett on May 14, 1946 to Dudley. On May 18, 1946, Dudley issued a check payable to Mrs. Bassett in the amount of $17,587. This check was endorsed by Slater as attorney in fact and was deposited in his personal account. On the same date the bank which was holding Dudley's escrowed deposit issued a cashier's check in the amount of $1,996 ($2,000 minus expenses of $4) in favor of Dudley and Mrs. Bassett. This check also was deposited by Slater in his personal account. Of the amount of $19,583, net proceeds of the sale, Slater on or before July 22, 1946, remitted $13,761.61 to Mrs. Bassett by check, retaining the remainder of $5,821.39. The *111 difference between the amount of $19,583 and the contracted selling price of $20,000 represented selling expenses of $92 and a credit against the purchase price of $325 which had been paid by the purchaser as rental under the lease-option. In all of Slater's negotiations for the sale of the property he held himself out as representing Mrs. Bassett. Before making any decisions Slater consulted Mrs. Bassett's son who in turn consulted Mrs. Bassett. On March 13, 1946, Dean, office manager of Slater Engineering Corporation (apparently acting on behalf of Slater) addressed a letter to Mrs. Bassett's son setting forth a list of expenses incurred with respect to this property, including transportation, hotel expenses, attorney fees, etc., totaling $2,280.71. This information was submitted in response to Bassett's wire asking for information to be used in connection with a tax return. On May 12, 1947, Mrs. Bassett wrote a letter to Slater in which she stated, in part: Last year, as you know, I sold a large portion of my Mississippi property known as Oak Grove Lodge. I have now decided to deed to you the balance of this property which is still in my name * * *. On July 21, 1947, Mrs. *112 Bassett executed a deed to the balance of the Bassett property to Slater for a stated consideration of one dollar "and other good and valuable considerations by the grantor received." In his return for the year 1946 Slater reported no income whatsoever from the transaction involving the Bassett property. No mention of such transaction was made in the return. In the notice of deficiency the respondent determined that Slater was paid a commission for the sale of the property of 25 per cent of the net proceeds from the sale and he, therefore, increased reported income by $4,896.75. [4]
Slater received in 1946 commissions of $4,896.75 for his services in connection with the sale of the Bassett property. Personal Exemptions In his income tax return for each of the years 1946 and 1947 Slater claimed a $500 personal exemption on account of his wife. In the notice of deficiency the respondent determined that Slater was not entitled to such exemption for those years. The respondent's *113 determination was based upon the ground that Mrs. Slater for those years had gross income in excess of $500 and that such gross income was not included in Slater's returns for those years. Fraud Some part of the deficiency in tax of the corporation for each of the taxable years 1944 through 1948 is due to fraud with intent to evade tax. Some part of the deficiency in tax of Slater for each of the taxable years 1944 through 1949 (Slater and his wife for 1948) is due to fraud with intent to evade tax. Statute of Limitations The income and declared value excess-profits tax return filed by the corporation for each of the taxable years 1944 and 1945 was false or fraudulent with intent to evade tax. The income tax return filed by Slater for each of the taxable years 1944 and 1945 was false or fraudulent with intent to evade tax. Opinion The petitioners have adduced very little evidence with respect to the various issues raised in this case. There was introduced in evidence the deposition of the decedent, Slater, which we have carefully considered. However, he testified to only a very few of the many items in controversy and his testimony was generally vague and inconclusive, *114 and in some instances at variance with other evidence of record. He submitted as exhibits to his deposition reproductions of the lists of items adjusted by the revenue agent and noted his characterization of some of the items. However, with respect to most of these he did not testify and these notations in reality are no more than his statement of disagreement with the revenue agent's characterizations of the items. On brief the petitioners contend that the respondent's determinations of deficiencies in tax were arbitrary and capricious and that, therefore, the presumption of correctness of such determinations falls, that the burden of proof shifted to the respondent to show that his determinations were correct, that he has not done so, and that, therefore, decision must be for the petitioners, citing, among other cases, Helvering v. Taylor, 293 U.S. 507; Thomas v. Commissioner, (C.A. 6) 223 F. 2d 83; and Weir v. Commissioner, (C.A. 6) 283 F. 2d 675. As a basis for their contention they argue that the revenue agent was arbitrary in several respects, such as disallowing items of deduction to the corporation and treating them as distributions *115 to Slater, disallowing certain deductions on the ground that they were capital expenditures, disallowing unsubstantiated items of deductions and increasing the amount of sales. It is stated by the petitioners that the revenue agent was on a "punitive expedition" against them. At the outset it should be stated that we find no evidence in the record that the revenue agent was on a punitive expedition against the petitioners. The evidence shows that he spent a great deal of time in his investigations with the aid of a special agent; that he made inquiry of Slater and representatives of the corporation with respect to various items which he questioned and asked for invoices and bills of the corporation; that when his corroboration was not available and Slater and other corporate representatives could not enlighten him, he went to the other parties involved in the transactions in order to attempt to confirm the items; that if he could obtain confirmation of an item, even though without the benefit of records, he made no adjustment with respect to such item; that he made a careful investigation of bank records; and that he made other investigations with respect to sources of nontaxable *116 income. In short, insofar as the record shows, the respondent's agents conducted a thorough and fair investigation. The individuals did not keep records and the corporate records were obviously unreliable, as has been shown by the evidence presented and as is in effect admitted by the petitioners in the instant case. Furthermore, the petitioners have admitted the correctness of substantial amounts of the adjustments made by the respondent and the respondent has affirmatively shown the correctness of some of his other adjustments. As will be pointed out hereinafter, very few of the adjustments of the respondent have been shown to be erroneous. Also it is to be noted that the respondent did not disturb the great bulk of the deductions claimed by the corporation. Under the circumstances, there is no basis whatever for concluding that the determinations of the respondent were arbitrary and capricious. It is axiomatic, of course, that the respondent's determination of a deficiency in tax is presumed to be correct and that the burden of proof is upon the petitioner to show error therein. Welch v. Helvering, 290 U.S. 111, *117 and Helvering v. Taylor, supra.The cases cited by the petitioners do not stand for the proposition that a showing or admission of error as to some items in the respondent's determination relieves the taxpayer of the burden of showing error as to other items. Indeed, it has been held to the contrary in several cases. Anderson v. Commissioner, (C.A. 5) 250 F. 2d 242; Commissioner v. Smith, (C.A. 5) 285 F. 2d 91; Clark v. Commissioner, (C.A. 9) 266 F. 2d 698; and Hoffman v. Commissioner, (C.A. 3) 298 F. 2d 784; all of which affirmed in whole or in part Memorandum Opinions of this Court. Accordingly, insofar as the deficiencies in tax are concerned, we approve the respondent's determinations except insofar as we have herein found or concluded that he erred. We will discuss separately the various items which are in controversy. Long-Term Capital Gains of the Corporation The corporation on brief concedes that the respondent's additions of unreported long-term capital gains are correct. Included for the year 1947 was an amount of $1,400 representing the net sales price of a 1942 Buick automobile. The respondent *118 also treated this amount as a distribution to Slater since, as is conceded, he deposited the check in his personal bank account. We think the respondent's determination was clearly correct. Such amount represents a dividend to Slater to the extent that the corporation had sufficient available earnings and profits. Capital Expenditures of the Corporation Charged to Expense For the years 1944, 1946, 1947, and 1948 the respondent determined that the amounts of $4,282.59, $667.49, $3,656.78, and $2,054.10, respectively, deducted by the corporation, were capital expenditures and made adjustments accordingly, including the allowance of depreciation on such items. The corporation has admitted the correctness of the respondent's determination as to the full amount for 1946 and $628.95 of the amount for 1947. On brief the corporation also admits that some unspecified portion of expenditures in connection with the leased buildings constituted capital expenditures, and claims that under the principle of Cohan v. Commissioner, (C.A. 2) 39 F. 2d 540, an allocation of amounts as between capital and repairs should be made. No evidence was introduced showing error on the part of *119 the respondent. Slater in his deposition did not testify with respect to these items. He did make certain notations on the exhibits submitted with his deposition with respect to some of the items to the effect that they were expense items. However, we cannot consider these vague notations as being any more than expressions of Slater's disagreement with the respondent's determination. They certainly are not sufficient to meet the petitioner's burden of showing error in the respondent's determination. On brief the corporation appears to agree that the respondent has properly identified the expenditures in question. Most of them would seem on their face to be capital in nature. There is no basis for the application of the rule of Cohan here since we are unable to find that any portion of any of the amounts involved constituted repairs. See Chesbro v. Commissioner, (C.A. 2) 225 F. 2d 674, affirming 21 T.C. 123. The respondent's determination for each of the years with respect to the capital expenditures charged to expense is approved. Personal Items of Mrs. Slater Charged to Expense For the years 1944, 1945, 1946, and 1947 the respondent disallowed as deductions *120 claimed by the corporation personal items paid by the corporation to or on behalf of Mrs. Slater in the respective amounts of $573.54, $195.30, $332.79, and $1,380.12. At the hearing, counsel for the petitioners stated that he did not contest the respondent's disallowance of these personal items. In addition, many of these items are already described on the corporate books as amounts paid to or on behalf of Mrs. Slater. The respondent's disallowance of deductions claimed on account of these items is approved. Personal Items of Slater (and Mrs. Slater for 1948) Charged to Corporate Expense As pointed out in our Findings of Fact, Slater was accustomed to having the corporation expend amounts on his and his family's behalf for numerous personal items such as doctor, nurse, hospital, and ambulance bills, school tuition, personal residence repairs and decoration costs, life insurance premiums, taxes on individual property clothing and jewelry costs, food and cigarette costs, utility bills for the residence, cost of stock and other property for him, and for other purposes. These expenditures were charged on the corporate books to various expense and inventory accounts, having in many *121 cases no connection whatever with the character of the item involved. The respondent determined that hundreds of such items were so expended and deducted by the corporation. The revenue agent testified, and other evidence shows, that in many instances the books of the corporation clearly disclosed that the items expended by the corporation were for the personal benefit of Slater or his family; that even in those instances the revenue agent often checked third party sources to verify the fact; that in most instances there were no paid bills and that he went to third party sources to determine the purpose of the payments; and that in those instances where he found that the payments were for Slater or his family or that money was received by Slater, he treated the items as distributions to Slater. The amounts which the respondent held to be nondeductible expenditures by the corporation and which he treated as distributions to Slater (Slater and his wife for 1948) were as follows: $10,337.38 for 1944; $11,379.36 for 1945; $33,826.23 for 1946; $21,845.37 for 1947; and $19,383.17 for 1948. The petitioners on brief admit many of these items, totaling $5,455.52 in 1944, $3,000.94 in 1945, *122 $1,240.79 in 1946, $5,994.14 in 1947, and $7,277.78 in 1948. It is conceded that these amounts should be disallowed as deductions to the corporation for those years and that such amounts constitute taxable dividends to Slater (Slater and his wife for 1948) to the extent that there were available earnings and profits in the corporation. On brief the petitioners argue that the intention of the stipulation between the parties was to fix the above amounts as the total amounts to be disallowed to the corporation and treated as distributions to Slater, but this the respondent strenuously denies. We think it is clear from the record that it was not the intent or effect of the stipulation to fix the stated amounts as the total amount to be disallowed. Rather, the stipulation represented no more than a concession on the part of the petitioners that to the extent of the stated amounts the respondent's determination was correct. The petitioners submitted very little evidence with respect to these items. Slater, in the schedules submitted with his deposition, made notations with respect to some of the detailed items. He gave testimony as to only a very few. From a careful examination of all *123 the evidence submitted, we must conclude that his notations, and his testimony in the main, are so vague and inaccurate as to be entitled to little, if any, probative value. For example, among the debit items totaling $934.95 in Slater's personal account which were reversed in 1945 and charged as corporate expenses, were such items as $57 which was paid for shirts for Slater and $50 denominated on the books of the corporation as a birthday gift for Mrs. Slater. In his notations on the exhibits in question, Slater had noted that this item of $934.95 was for automobile mileage; the corporation had treated these items as travel and entertainment. Another example - in 1947 debit items in the personal account totaling $976.21 which had been reversed and charged to corporate expense consisted of various items of medical expenses and school tuition. Slater noted on his exhibit that this item of $976.21 was for travel expense and the corporation on its books had shown it to be for travel and entertainment. Still another example - the item of $1,571.96 which had been reversed as a debit entry in Slater's personal account in 1947 and charged to corporate expenses was made up of numerous medical *124 items which are admittedly of a personal nature. Slater had made notations that these were for car mileage expense and the corporation on its books had treated them as cost of inventory. We have set forth in the Findings of Fact the amount of expenditures made by the corporation which are admitted to have been made on behalf of Slater and his family as well as some other items which the record affirmatively shows were of the same character. With respect to the remainder of the items disallowed by the respondent as being of similar character and treated as distributions to Slater, the petitioners have not met their burden of showing error in the respondent's determinations. The petitioners ask us to find that many of the amounts credited to Slater's personal account should not be disallowed as corporate deductions and charged as distributions to Slater, their ground being that Slater had made expenditures out of his own pocket on behalf of the corporation for traveling and entertaining expenses, etc., and that these credits were in reimbursement to him for those expenditures. Slater testified that he had incurred expenses on behalf of the corporation for items such as automobile *125 expense and that he was reimbursed to some extent. However, he did not testify how much was spent and reimbursed and there is no basis in the record for even approximating any such reimbursed amounts. There is no evidence to show that the credits to his personal account had any connection with any such expenditures made by him on behalf of the corporation. Indeed, the evidence is quite clear that some of the credits to which the petitioners refer were made to offset numerous specific items of expense which had been incurred by the corporation and which had been debited to Slater's personal account, and that all these expenditures were of a personal nature. Under the circumstances, we cannot conclude that the respondent was in error in disallowing these credits as deductions to the corporation and treating them as distributions to Slater. Upon the evidence we cannot find that the corporation has been denied deductions to which it is entitled as direct payments made by it for traveling and entertainment expenses or any amounts which it may have paid to Slater in reimbursement thereof. We have given particular attention to the item of $21,191.93 credited to Slater's account on December 31, 1946. It *126 differs from the other credits referred to in that there was at that time a credit balance in the account. We have shown in some detail the facts with respect thereto. The respondent held that the corporation had already taken into account as a cost of goods sold the cost of the assets involved in that transaction and, therefore, disallowed the $21,191.93 as a cost of goods sold. Furthermore, there was no reason why the corporation should pay Slater anything for assets which he did not own and for which the corporation had already made payment. By crediting this amount to his account it was made available to him for withdrawal or as an offset against any personal items which the corporation might incur on his behalf. It may be added that in his deposition Slater admitted that these assets belonged to the corporation and not to him. We think it clear that the respondent correctly disallowed this item as a deduction to the corporation and treated it as a distribution to Slater. On December 31, 1947, a credit was made to Slater's personal account in the amount of $3,587.25, which exactly offset the debit balance in his account. This had the effect of relieving him of any liability for *127 such debit balance. We think there is no question that this constituted taxable income to him. The corporation deducted this same amount as a cost of Memphis inventory. Clearly the respondent was correct in disallowing this deduction to the corporation. It is contended that the credits to Slater's personal account (as well as other items which the respondent treated as distributions to Slater) should not be treated as distributions, it being argued that there was no economic gain to him since the corporation owed him at all times more money than it could pay and remain in business. We think this argument is entirely without merit. There is no showing that the credits in question were intended as repayments of any amounts owing from the corporation to Slater. As pointed out, with respect to some of such credits, Slater had already had the benefit of expenditures on his behalf by the corporation and the credits merely had the effect of eliminating the debit entries in his account and thereby precluded any possible view that he owed the corporation for any of the amounts expended on his behalf. During the years 1944, 1945, and 1946 the corporation paid or credited to Slater the amounts *128 of $1,451.76, $3,275, and $3,000, respectively, purported to be for the use of automobiles. The corporation deducted these amounts as business expenses, but they were disallowed by the respondent as deductions of the corporation and were treated as distributions to Slater. As shown by our Findings of Fact, there were only three automobiles which were used by Slater or the corporation in those years. One of them which had been purchased for Slater's wife was used by the corporation only on rare occasions, and we do not understand that any of the amount purported to be for the use of that car. One of the others was paid for by the corporation and was listed as its asset and depreciation was taken with respect thereto. The third one, which had been acquired in 1943, was paid for by the corporation and, although Slater's personal account was initially debited with the cost thereof, this debit was reversed by a corresponding credit entry in that year, and Slater never did stand the cost of the automobile. Instead the corporation bore the cost and charged it to expense in 1943. The record does not show whether this third automobile was titled in the name of Slater or of the corporation, *129 but this would seem to be immaterial. If it was in his name it would seem that he was holding title for the benefit of the corporation, since it had paid for it. Under the circumstances, we see no justification for the corporation's paying any amounts to Slater for the use of automobiles, and we sustain the respondent's disallowance of deductions claimed by the corporation on account thereof. (The petitioners have conceded nondeductibility of the amount for 1944.) These payments constituted distributions to Slater which are taxable as dividends to him to the extent they were paid out of earnings or profits of the corporation. (This is conceded by the petitioners with respect to the amount paid for 1944.) Among the items disallowed as deductions to the corporation and treated as distributions to Slater were amounts paid by the corporation to the Little Rock Club. We are satisfied that these expenditures were for corporate business purposes and were not personal expenditures. The respondent's determinations with respect to these items as to both the corporation and Slater are disapproved. Also among the items disallowed by the respondent as deductions to the corporation and treated *130 as distributions to Slater were proceeds of corporate checks drawn by Slater in favor of various hotels, banks, and other payees. Slater testified that at times both when he was in Memphis and when he was traveling, he often had to cash corporate checks in order to pay local labor, his own traveling expenses, and other types of expenses for the corporation. He testified to only a very few specific items. However, it is evident that he meant that these were typical of other such checks which he cashed. We are satisfied that of the aggregate of amounts of such checks disallowed by the respondent for each of the years 1944 through 1948, some portions constituted payments made on behalf of the corporation. We have carefully examined the lists containing hundreds of items which the respondent has disallowed, as shown by portions of the revenue agent's report submitted in evidence. Because of the lack of detailed evidence it is impossible to determine accurately what portion of the aggregate proceeds of such checks was used for corporate purposes, but we have exercised our best judgment, bearing heavily against the taxpayer who has the burden of proof, and have concluded and found as a fact *131 that the following amounts constituted business expenses paid from funds obtained in this manner: $900 for 1944; $350 for 1945; $1,000 for 1946; $1,600 for 1947; and $1,200 for 1948. Cohan v. Commissioner, supra.To this extent the respondent's determinations are disapproved. Except as specifically held hereinabove, the petitioners have failed to prove error in the respondent's determination of personal items of Slater and his wife which are to be disallowed as corporate deductions and treated as distributions to Slater. Unallowable or Unsubstantiated Items Here again the petitioners have submitted little or no evidence as to the items disallowed by the respondent. In the schedules submitted by Slater with his deposition he made notations of objections as to only a relatively few items, namely, 8 items totaling $1,396.73 for 1946 and 11 items totaling $964.34 for 1947. He made no notations of objections to any of the items for 1944, 1945 or 1948. He did not testify as to any of these items. Here again his notations amount to no more than objections to the respondent's treatment and they have little, if any, probative value. The petitioners have not adduced proof *132 to show error as to the disallowance of any of these items. We have carefully checked each reference to testimony made by the petitioners on brief, but find that they do not refer to any of the items involved under this issue. The corporation contends on brief that the respondent's determination disallowing these deductions was arbitrary, in that the disallowances were made, not because the agent ascertained that they did not constitute allowable deductions, but merely because supporting invoices were not available. It is contended that the record shows that large amounts were spent in connection with out-of-town installation jobs which were properly allowable in determining corporate net income, and that a major portion of the disallowed amounts should be allowed as a deduction under an application of the rule of Cohan v. Commissioner, supra. The evidence here presented does not show that the respondent, in making these disallowances, acted arbitrarily. He did not disallow the great bulk of the items deducted by the corporation which appeared to be payments to companies or concerns with which the corporation normally did business. There is no showing that the amounts *133 disallowed consisted to any extent of corporate expenditures in connection with out-of-town installations. For all that appears all expenditures for that purpose were included in the items which were allowed. The adjustments made were principally with respect to non-recurring items which the books showed were paid to persons or concerns with whom the corporation did not normally do business and as to which items the agent could obtain no confirmation either by invoice or other records of the corporation, by consultation with corporate officials, or by attempts to contact the payees. The mere fact that these were recorded on the books as deductible items was not binding upon the respondent, particularly since the books had in so many respects proven to be inaccurate. As stated, some of the amounts disallowed were shown on the books as having been paid to Mrs. Slater. In the absence of any record or explanation showing why the amounts were paid to Mrs. Slater, we think the respondent was justified in disallowing the amounts as deductions to the corporation. With respect to the disallowance of deductions of portions of the total disbursements made from the petty cash account, it appears *134 that the revenue agent had no means whatever of verifying any of the payments since there were no vouchers or other records with respect thereto. He testified that since many of the corporation's small disbursements, which might be expected to be paid from petty cash, were in fact paid by checks, the aggregate amounts of disbursements for petty cash appeared to be abnormally large and that therefore portions of such disbursements were disallowed as deductions. While, because of the petitioner's failure to keep proper records, it may be difficult or impossible to prove error in the respondent's determination, this does not mitigate the burden placed on petitioners, and we cannot conclude that the respondent's disallowances were arbitrary or without reason. As stated, the petitioners have not shown that a single item disallowed under this category was erroneous. If the determinations were indeed arbitrary and unfounded, it would seem that the petitioners could have and should have adduced evidence to show that at least some of the items were properly allowable. Since there is no evidence that any portions of the amounts disallowed constituted deductible business expense, there is no *135 basis for the application of the Cohan rule. Chesbro v. Commissioner, supra. We approve the respondent's disallowance of these items. Sales Understated Of the amount of $5,457.09 by which the respondent increased the corporation's sales for 1944, the evidence shows that $4,840 represented a transaction by Slater with which the corporation had no connection. Accordingly, the respondent's determination with respect to sales of the corporation for 1944 is disapproved to the extent of $4,840, and his determination that the corporation made a distribution to Slater in the amount of $4,840 is also disapproved. The remainder of the amount has been shown by the evidence to represent sales of the corporation, the proceeds of which were received by Slater. Accordingly, we approve the respondent's determination that the remainder totaling $617.09 represented a proper increase of corporate sales for 1944 and a distribution to Slater. The evidence shows that of the amount of $577 by which the respondent increased the corporation's sales for 1945,$487 was from a sale by the corporation, the proceeds of which were received by Slater. Clearly, the respondent was correct in treating the $487 *136 as an increase of sales of the corporation for 1945 and determining that Slater had a distribution in that amount. The remainder of the respondent's adjustment for 1945 is approved because there has been no showing of error with respect thereto. We have set forth in some detail in the Findings of Fact the explanation of the respondent's computation of the net amount of sales understated by the corporation for 1946 in the amount of $590.45. The evidence clearly shows that the corporation had omitted net sales totaling $590.45. The evidence also clearly shows that Slater had appropriated proceeds of sales of the corporation totaling $1,375, and that therefore the respondent properly held such amount to be a distribution to him. The respondent held that the total distribution to Slater by way of receipt of proceeds of corporate sales in 1945 was $1,591. There is no evidence as to the difference of $216, but since the petitioners have not met their burden of proof with respect thereo, the respondent's determination is approved. Of the amount of $4,609.74 by which the respondent increased the unreported sales of the corporation for 1947, the amount of $3,200 is shown by the evidence *137 to have been from the sale by the corporation of two compressors and one air conditioning unit, which amount was appropriated by Slater. The evidence thus clearly shows that the respondent was correct in increasing the corporation's sales by $3,200 and treating such amount as a distribution to Slater. The respondent's determination with respect to the remainder of the adjustment of $4,609.74 is approved because of failure to show error therein, there being no evidence with regard thereto. The petitioners have presented no evidence with respect to the respondent's determination that the corporate sales for 1948 were understated by the amount of $444, and that Slater received distributions in that amount. These determinations of the respondent are approved for failure of the petitioners to show error with respect thereto. Inventory Adjustments The respondent increased the corporation's material inventories as of the end of each of the years 1946 and 1948, as described in some detail in the Findings of Fact, thereby increasing reported income of the corporation for each of those years. The petitioner contends on brief that it did not use inventories in computing taxable income *138 and that hence it was error for the respondent to increase reported income by increasing closing inventory and thereby decreasing the cost of goods sold. However, an examination of the corporation's returns clearly shows that the cost of goods sold was determined by use of material inventories. With respect to the year 1946, the respondent determined that a reduction of $17,235.31 made by the petitioner in its material inventory as of the end of 1946 was not justified and he reversed such entry and thereby increased income by that amount. The corporation has offered no evidence to show any justification of its reduction or indeed any details with respect thereto. Its argument is that the respondent's restoration of that amount to closing inventory was based on pure speculation and that the respondent has introduced no evidence to show that the books were incorrect. Here again the petitioner has not shown error in the respondent's determination and we cannot assume that such determination is erroneous or was made without reason. On brief the petitioner states that it is likely that the addition which it made to cost of sales for 1946 resulted from a failure during the year to properly *139 charge currently to one or more installation jobs the cost of material entering into such job or jobs. However, this speculation is not a proper substitute for proof. Under the circumstances, we are constrained to approve the respondent's determination with respect to the $17,235.31 inventory adjustment for 1946. The amount by which the respondent increased closing material inventory for 1948 was $54,700, which resulted in an increase of taxable income for that year by that amount. [5]
The petitioners contend that this adjustment was arbitrarily made in that the revenue agent, in finding that there was at the end of 1948 an excess of actual inventory over book inventory, relied upon statements made by the corporation in order to obtain a favorable credit rating. It is in effect contended that such statements may not be reliable. *140 Here again the petitioners have not shown that the respondent's adjustment was erroneous and here again the speculations made by the petitioners on brief cannot be accepted in lieu of evidence to sustain their burden of proof. Such evidence as the record contains tends to support the respondent's view that there was an excess of physical inventory over book inventory, [6] and it may well be that, as contended by respondent, this indicates that there had been excessive amounts of inventory previously charged to cost of goods sold. On brief the petitioners argue that in such event it would be necessary to review the beginning inventory for 1948 and earlier years to determine whether income flowing from understated inventories should be taxed in prior years. But as to this the burden of proof was upon the petitioners and there is no evidence with regard thereto. We hold that there has been no showing of error on the part of the respondent with respect to this item and his determination is approved. *141 Additions to Tax under Section 291(a) The respondent determined that the corporation was liable for additions to tax under section 291(a) of the Internal Revenue Code of 1939, [7] for failure to file excess profits tax returns for the taxable years 1944 and 1945. It has been stipulated that the corporation did not file excess profits tax returns for those years and on brief the petitioner makes no argument that it is not liable. It may be that this issue has been conceded by the petitioner. In any event, the burden of proof was upon it to show that its failure to file returns for those years was due to reasonable cause and not due to willful neglect. There is no evidence to this effect, accordingly, the amount of addition to tax for which the petitioner is liable will be computed in connection with the recomputation under Rule 50, in the light of our decisions with respect to other issues relating to corporate income. *142 Slater and his Wife Contributions In his deposition Slater testified that he, his wife, and his son each belonged to a different church, but that he at times attended each church and made cash contributions thereto. He also testified that at his place of business he was solicited for contributions by many charitable or educational organizations and that he made contributions to the Red Cross, Boy Scouts of America, and other similar organizations, and that Mrs. Slater also made contributions. He testified that in making out his returns he estimated the amounts of contributions to churches and other organizations to the best of his memory and that Dean helped to remind him of some contributions which he had made. No checks, receipts or other documents were submitted in support of the claimed deductions. We are satisfied from Slater's testimony that he did make contributions to churches, although from his testimony we think that in some years the amounts which he claimed are excessive. We are also satisfied that he made some contributions to other charitable or educational organizations. On brief counsel for the petitioner contends that some amounts should be allowed, determined *143 in accordance with the rule of Cohan v. Commissioner, supra.We agree and in the exercise of our best judgment we have found as a fact that the deductions for contributions to which Slater was entitled for the years 1944 through 1949, inclusive, $300were, $350, $300, $300, $350, and $425, respectively. Upon the recomputation under Rule 50, these amounts will be allowed as deductions. Medical Expenses For the year 1944 the respondent disallowed all the medical expense deduction claimed by Slater. From the notice of deficiency it appears that this disallowance was not on the ground that the claimed medical expenses had not been expended, but solely on the ground that the amount of such expenditures did not exceed 5 percent of corrected adjusted gross income, the limitation provided by section 23(x)(1) of the Internal Revenue Code of 1939. The amount of deductible medical expense, if any, will be determined upon a recomputation under Rule 50. Similarly, for the year 1948 the respondent limited the amount of deductible medical expenses. Here again the deductible amount of medical expenses will be determined in the recomputation under Rule 50.
The medical expense issue *144 for 1947 presents a different problem. In his original return for that year Slater did not report any medical expenditures, but in an amended return he reported uncompensated medical expenditures in the amount of $2,159.88, of which he claimed as a deduction $1,743.90, under the statutory limitation. The respondent's notice of deficiency did not deal to any extent with medical expenditures since the respondent apparently treated the original return as the return filed pursuant to the requirements of the statutes. However, in the petition Slater made claim for a medical deduction of $1,743.90, and as to this the burden of proof is upon the petitioner. No evidence has been presented to show that Slater or his wife made any medical expenditures in 1947. From the amended return it would seem that the items reported therein as medical expenditures included medical expenditures in the amount of $2,057.88 which had been paid on their behalf by the corporation. We have hereinabove held that this amount of $2,057.88 was not properly a deduction of the corporation and that it represented a distribution to Slater taxable to him as a dividend to the extent of available earnings and profits of *145 the corporation for 1947. Under the circumstances, we think it must be considered that this amount of medical expenditures, $2,057.88, was paid by Slater to the extent such amount is included in his income as a constructive dividend. If, as a result of our holdings herein, the aggregate amount of distributions in 1947 is in excess of the corporate earnings and profits available for 1947, with the result that only a portion of such aggregate amount of distributions is treated as dividends, it will be considered that a proportionate amount of each distribution constituted a taxable dividend. In this manner the amount of medical expenses to be deemed paid by Slater in 1947, as well as the amount deductible under the statutory limitation, will be determined under Rule 50. Unexplained Bank Deposits The respondent held that Slater had taxable income in the following amounts represented by unexplained bank deposits: $15,599.08 for 1944; $19,999.17 for 1945; $4,139.39 for 1946; $12,570.75 for 1947; $3,214.66 for 1948; and $8,153.70 for 1949. It is well settled that unexplained bank deposits are *146 evidence of receipt of taxable income. Hoefle v. Commissioner, (C.A. 6) 114 F. 2d 713, affirming a memorandum Opinion of this Court; Doll v. Glenn, (C.A. 6) 231 F. 2d 186; Goe v. Commissioner, (C.A. 3) 198 F. 2d 851, affirming a Memorandum Opinion of this Court; O'Dwyer v. Commissioner, (C.A. 4) 266 F. 2d 575, affirming 28 T.C. 698, certiorari denied 361 U.S. 862; and Fada Gobins, 18 T.C. 1159, affd. (C.A. 9) 217 F. 2d 952. It is also well established that the respondent's determination that unidentified deposits constitute income is prima facie correct and the burden is upon the taxpayer to overcome this presumption. Hoefle v. Commissioner, supra; Doll v. Glenn, supra; O'Dwyer v. Commissioner, supra; and Davis v. United States, (C.A. 6) 226 F. 2d 331. The fact that the circumstances are such that it is impossible for the taxpayer to meet this burden does not affect the rule. Doll v. Glenn, supra.And the unsupported naked statement by the petitioner that such deposits did not constitute taxable income *147 is not necessarily enough to sustain his burden. Hoefle v. Commissioner, supra.
The petitioner contends that the respondent's determinations with respect to income on account of unexplained bank deposits should be disapproved because of the fact that the respondent did not show a likely or possible source of receipt of taxable income. This contention is without merit. In United States v. Massei, 355 U.S. 595, the Supreme Court held, on the contrary, that should all possible sources of nontaxable income be negatived there is no necessity for proof of a likely source of taxable income. In the instant case the revenue agent testified that in his computations he eliminated any deposits which he could determine were derived from nontaxable sources such as gifts, or which represented income which Slater had reported or income which he, the agent, had otherwise treated as taxable income, and deposits made from withdrawals from Slater's other bank accounts. On brief it is further contended by the petitioner that we should hold that there was no income from this source *148 because Slater testified in his deposition that none of the deposits flowed from unreported income. Actually Slater did not so testify with respect to all the deposits which the respondent determined to constitute taxable income. He so testified in effect with respect to deposits totaling $15,150 for 1944; $1,740 for 1945; $3,670 for 1946; $8,400 for 1947; $1,930 for 1948; and $5,932 for 1949. In any event, under the circumstances here presented we cannot accept his mere testimony, when unsupported, as being sufficient to overcome the presumption in favor of the correctness of the respondent's determination. Hoefle v. Commissioner, supra.His testimony with respect to particular deposits was vague and uncertain. He testified generally that he had received gifts from his parents ranging in amount from $300 to $5,000 and that he borrowed from his mother; that sometimes these amounts were deposited directly in his bank accounts and that sometimes they were put in his safe deposit box; and that some of the deposits may have been from these sources or from his savings account or from the sale of United States Savings Bonds, but as to none of the deposits was he certain as *149 to the source. He did not testify as to the number of gifts or the times he received them. The revenue agent testified that he had eliminated from his calculations any gifts, loans, or payments from Slater's parents which he could identify. Slater's wife also received gifts from her father during the years 1944 to 1948, and during the 1930's she had inherited an amount of $3,000 to $4,000. However, there is no showing that any amounts so received by her were deposited in Slater's savings account or in his safe deposit box, or that any of the deposits in question came directly or indirectly from these funds of Florence Slater. While Slater testified that several of the deposits may have come from his safe deposit box, and while it is true that the bank records show that on the dates of some of these deposits Slater had entered his safe deposit box, the evidence does not establish that these represented withdrawals from the box. There is no evidence as to how much Slater had in his box at any particular time. He testified that he did not keep an inventory of the cash therein, but that there had been at some undisclosed time as much as $10,000 in the box and that he had both deposited *150 and withdrawn as much as $5,000 at a time, although not often. However, even if some of these deposits did come from his safe deposit box, the evidence does not show that the funds withdrawn represented nontaxable income or income of prior years. With respect to a number of the deposits in question, Slater testified that they may have represented proceeds from the redemption of United States Savings Bonds or other bonds. However, the only evidence of bonds redeemed by the Slaters is a certificate executed by an official of the Bureau of Public Debt which shows that during the years in question there was no record of the issuance of any United States Savings Bonds registered in the name of Slater or his wife and redeemed during the years 1944 through 1949, except bonds redeemed in 1948 for a total amount of $920.25, and that there was no record of any other United States securities registered in the name of or redeemed by Slater or his wife during such years. Slater stated in his deposition that he believed that the two cash deposits totaling $4,920 which he made to his account in the Union Planters National Bank & Trust Co. on May 5, 1944, represented money he had borrowed from *151 his mother when he purchased property at 631 Monroe Avenue. He did not testify as to when he purchased that property. However, it is to be noted that in the revenue agent's report it was stated that such property had been bought on April 9, 1945, at a cost in excess of $10,000 and that the respondent allowed depreciation for 1945 (and not for 1944) based on such cost. In view of the fact that apparently such property was not purchased until approximately one year after such deposit was made, we cannot conclude that the deposit in question represented money borrowed from Slater's mother for purposes of such purchase. The source of such deposit remains unproven. Slater also stated that he believed that a cash deposit of $5,230 which he made to his account in the Union Planters National Bank & Trust Co. on December 7, 1944, had been withdrawn from his safe deposit box and that this would represent accumulations which he had made in prior years. The records of the bank show that Slater did make an entry into his safe deposit box on that date. The records of the bank also show that Slater had made 12 other entries into his safe deposit box in 1944 prior to December 7. We, of course, have *152 no information as to whether he deposited money therein on those occasions or withdrew money, or in what amounts. While it may be true that he had some cash in the box as of the beginning of 1944, we cannot conclude on the evidence presented that it has been shown that this particular deposit of $4,920 made on December 7, 1944, was made from withdrawals from the box representing accumulations of prior years. Under the circumstances, we are constrained to approve the respondent's determination with respect to all deposits, with the exceptions which we will now note. Slater testified that he believed that the $5,000 currency deposit made by him to his account in the Union Planters National Bank & Trust Co. on December 7, 1944, represented an amount which was withdrawn from his savings account in the First National Bank. The evidence shows that Slater did withdraw $5,000 on that date from his savings account in the First National Bank. We have concluded and have found as a fact that the source of the deposit was the amount withdrawn from Slater's savings account. Accordingly, we hold that such amount did not constitute taxable income in the year 1944. The respondent concedes that *153 a deposit of $920.25 made by Florence Slater in her account in the Union Planters National Bank & Trust Co. on April 12, 1948, represented amounts received by her upon the redemption of series "E" United States Savings Bonds and that he erroneously included such deposit in taxable income of Slater and his wife for 1948. Except for the two deposits above mentioned, we approve the respondent's determination of income for each year based upon unexplained deposits to the bank accounts and the brokerage account. Automobile Mileage Expense The respondent disallowed the full amount of deductions claimed by Slater as automobile mileage expense for the years 1944 through 1947, in the respective amounts of $1,300, $1,750, $2,100, and $2,220. We have no doubt that Slater did travel extensively in the corporation's trade territory in connection with the corporation's business as he testified in his deposition. He testified he incurred expenses in connection with the operation of the car or cars which he used and that some of such expense was reimbursed to him and some was not. He further testified that the amounts claimed were fixed at the end of the year on the basis of the mileage which *154 he estimated he had traveled. There was no explanation as to whether the amounts claimed were estimates of gasoline used or whether they included other items such as depreciation on the cars. We have already hereinabove shown that the cars used on behalf of the corporation had been paid for and belonged to the corporation. The revenue agent testified that his basis for concluding that the claimed amounts were not deductible was that any expenses incurred by Slater had been reimbursed by the corporation. Upon the record it would be extremely difficult to arrive at any amount representing expenses which Slater himself may have expended and which were not reimbursed, but we find it unnecessary to attempt to fix such amounts. Clearly the travel was undertaken in connection with the corporation's business. There has been no showingwhatever that Slater was expected to personally bear any traveling expenses in order to earn his salary as a corporate officer. Any expenses which Slater may have borne were not ordinary and necessary expenses of any business conducted by him or necessary in earning his salary, but were expenses of the corporate business; they did not constitute expenses deductible *155 by him. Heidt v. Commissioner (C.A. 7) 274 F. 2d 25, affirming a Memorandum Opinion of this Court; H. William Ihrig, 26 T.C. 73; Andrew Jergens, 17 T.C. 806; and Hal E. Roach, 20 B.T.A. 919. Entertainment and Promotion Expense In his deposition Slater testified that he expended an average of at least $50 per month for entertainment. These were estimates, and on brief it is urged that he be allowed deductions on the basis of $50 per month. The amounts which he had deducted and which had been disallowed by the respondent were $600 for 1944; $960 for 1945; $750 for 1946; $750 for 1947; $398 for 1948; and $600 for 1949. Here again we find it unnecessary to find how much Slater expended for this purpose. It is clear from his testimony that the entertainment was for the purpose of promoting the business of the corporation, and for the same reasons which we have shown above with respect to automobile mileage expense, we hold that none of the entertainment expense constituted expenses deductible by Slater. Constructive Dividends The respondent determined in each of the years 1944 through 1949 that the corporation made hundreds *156 of payments to Slater or on behalf of him or his family, and that Slater had appropriated to his own use funds which rightly were due to the corporation, and that all these amounts constituted distributions to Slater. Included in the amounts which he determined constituted distributions to both Slater and his wife in 1948 were amounts paid by the corporation to or on behalf of Mrs. Slater. He further held that these distributions constituted constructive dividends to Slater (Slater and his wife for 1948) to the extent of the amount of earnings or profits available for the payment of taxable dividends, as determined by him. The amounts which he determined to be taxable as dividends were as follows: $13,513.92 for 1944; $9,115.76 for 1945; $35,417.23 for 1946; $17,673.84 for 1947; $19,827.17 for 1948; and $1,200.66 for 1949. It is well established that amounts paid by a corporation to or on behalf of its stockholders may constitute distributions and that these may be taxed as dividends to the extent paid out of available earnings and profits of the corporation. Irving Sachs, 32 T.C. 815, *157 affd. (C.A. 8) 277 F. 2d 879, certiorari denied 364 U.S. 833, and cases cited therein; and American Properties Inc., 28 T.C. 1100, affd. (C.A. 9) 262 F. 2d 150. It is also well established that amounts of income due a corporation, which are diverted to its stockholders to their own use, may constitute taxable dividends to such stockholders. Drybrough v. Commissioner, (C.A. 6) 238 F. 2d 735, affirming on this issue United Mercantile Agencies, Inc., 23 T.C. 1105; Dawkins v. Commissioner, (C.A. 8) 238 F. 2d 174, affirming on this issue a Memorandum Opinion of this Court; and Jack M. Chesbro, 21 T.C. 123, affd. (C.A. 2) 225 F. 2d 674, certiorari denied 350 U.S. 995. As pointed out hereinabove the petitioners admit that some of the amounts paid by the corporation to or for Slater and his family constituted taxable dividends to the extent of available earnings and profits of the corporation. In addition, we have found that the evidence affirmatively supports the respondent's determination that other payments by the corporation constituted distributions. *158 On the other hand, we have found that the respondent was in error in holding that some of the payments constituted distributions. With respect to the remainder of the items which the respondent held constituted distributions to Slater (Slater and his wife for 1948) the petitioners either presented no evidence, or the evidence was insufficient to show that they did not constitute distributions; with respect to them we approve the respondent's determination that they constituted distributions. Of course, and the respondent so concedes, distributions are not taxable as dividends unless paid out of earnings or profits of the corporation accumulated since February 28, 1913, or out of earnings or profits of the taxable year. Section 115 of the Internal Revenue Code of 1939. [8]
*159 At the hearing counsel for the parties agreed that at January 1, 1944, the corporation had earnings and profits accumulated since February 28, 1913, in the amount of $2,839.66, unless counsel for the petitioners is correct in his contention that this amount should be reduced by $2,610.05 on account of interest accrued at December 31, 1943, on notes of the corporation owing to Slater. Very little evidence is available with respect to the corporation's indebtedness to Slater. The evidence shows, and we have found as a fact, that there was on the books of the corporation an account denominated "W. F. Slater Loan Account," which showed a balance in favor of Slater as of the end of 1943 in the amount of $23,321.83. Whether this full amount was represented by notes has not been shown. An accountant who testified on behalf of the petitioners stated that he had seen some notes, but not in the full amount of the loan account balance at December 31, 1943. He stated that those which he saw did not, by their terms, bear interest. Indeed, counsel for the petitioners concedes that the notes did not specifically call for the payment of interest. It is his contention, however, that in such a case *160 the statutory law of Tennessee requires that interest be paid at 6 percent. He refers to sections 47-1603, 47-1604, 47-1607, and 47-1608 of the Tennessee Code Annotated. Section 47-1608 of such Code provides that the time from which interest may be computed shall be the day when the debt is payable, unless another day be fixed in the contract itself. Section 47-1607 provides that all bonds, notes, bills of exchange, and liquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it is expressed that interest is not to accrue until a specific time therein mentioned. Here, as stated, we do not know whether or to what extent the balance in the loan account at December 31, 1943, was represented by notes signed by the debtor. Nor do we know when any such notes became due. Under the circumstances we cannot find that at January 1, 1944 the corporation was indebted to Slater for any interest. It is unnecessary, therefore, to consider the contention of *161 the respondent that in any event there should be no reduction in accumulated earnings and profits because of the fact, as admitted by counsel for the petitioners, that no interest was ever paid. We have accordingly, found as a fact that at January 1, 1944, the corporation had earnings or profits accumulated since February 28, 1913, in the amount of $2,839.66. The amount of such accumulated earnings and profits in any of the particular years here involved and the amount of earnings or profits for any of the particular years will be determined in connection with the recomputation under Rule 50, in the light of the various conclusions reached herein. The respondent concedes on brief that his determination of earnings and profits available for the payment of taxable dividends was erroneous in that he did not take into account any additions to tax asserted against the corporation for fraud under section 293(b) of the Internal Revenue Code of 1939 for the years 1944 to 1948, inclusive, or for failure to file excess profits tax returns for the years 1944 and 1945 under section 291(a) of the Code. He properly concedes that in determining the amount of corporate earnings and profits available *162 for the payment of dividends there should be deducted any such additions to tax for which we may hold the corporation liable, such additions to be accrued and deducted (the corporation being on the accrual method of accounting) in the years in which the corporation filed its returns, or should have filed its returns, even though the additions are contested. See Estate of Esther M. Stein, affd. sub nom Levine v. Commissioner, ( C.A. 2) 250 F. 2d 798; Stern Brothers & Co., 16 T.C. 295; and Rev. Rul. 57-332, 1957-2 C.B. 231. Commissions The respondent held that Slater received as commissions on the sale of the Bassett property one-fourth of the net proceeds from the sale, or $4,896.75. The evidence shows that Slater retained an amount in excess of that but that he had incurred certain expenses in connection with the sale. The petitioner contends that this was not a commission. Slater, in his deposition, testified that because of the services he had performed for Mrs. Bassett in 1930 in recovering this property for her, she made an oral gift to him of a 20 or 25 percent interest in the property, and that he owned such interest until the *163 sale of the property in 1946. If this were so, the sale should have been reported in Slater's return for 1946, but it was not. Slater testified that there was no gain on the transaction, but he did not show the basis of the property. On brief, the contention is made that Slater did not actually come into possession of the gift until 1946 when the property was sold. If the import of this is that whatever Slater received in 1946 was non-taxable as a gift, the contention is without merit. Even if we were to accept Slater's testimony that he received a gift of property in 1930, the amount retained by him in 1946 from the sale would not be a gift but would represent proceeds of the sale. But on this record we cannot conclude that Slater was the recipient of a gift of an interest in the property in 1930. Both he and Mrs. Bassett, in all dealings with respect to the property, represented that the property belonged to Mrs. Bassett. She appointed him her attorney in fact to care for and sell the property and he represented to Dudley, the optionee-lessee, that any improvements made by Dudley would be the property of Mrs. Bassett if Dudley should fail to exercise the option to buy. Slater *164 never took any action with regard to the property without discussing it with Mrs. Bassett's son, who in turn would contact Mrs. Bassett. Furthermore, Mrs. Bassett, in a letter to Slater in 1947, stated that "Last year, as you know, I sold a large portion of my Mississippi property" (italics supplied). Testimony of the revenue agent with respect to the basis for the respondent's determination, elicited by counsel for the petitioner on cross-examination, revealed that the respondent's action was based upon a statement made by Mrs. Bassett to a special agent that Slater did not own an interest in the property and that she paid him a 25 percent commission for the sale, although the agent conceded that Mrs. Bassett's son had made some statement or contention to the internal revenue service to the effect that Slater had been given an interest in the property many years before the sale. Mrs. Bassett had never executed any deed to Slater evidencing a transfer of an interest in the property prior to the transfer to him in 1947 of the portion of the property remaining after the sale. We think that if a gift was ever made by Mrs. Bassett to Slater it was made by this transfer in 1947. The *165 fact that she found it necessary to make a transfer of this remainder in 1947 would seem to negative the idea that she had previously transferred to him an undivided interest in the property as a whole. In this state of the record we cannot conclude that the respondent was in error in his determination. Rather, the evidence sustains his determination that Slater was paid a commission. Slater had rendered valuable services to Mrs. Bassett over the period 1944-1946 in renting the property, clearing title, and effecting the sale. We cannot conclude that 25 percent of the net proceeds is unreasonable compensation for such services. We approve this determination of the respondent. Personal Exemptions Section 25(b)(1) of the Internal Revenue Code of 1939, as it applied to the taxable years 1946 and 1947, provided that there should be allowed for the purposes of both the normal tax and the surtax an exemption of $500 for the spouse of the taxpayer if a joint return was made, or a separate return was made by the taxpayer, and his spouse had no gross income and was not the dependent of another taxpayer. This issue for the taxable years 1946 and 1947, although raised in the petition, *166 was not mentioned on brief and has apparently been abandoned. In any event no evidence was submitted to show that the respondent was in error in disallowing the claimed exemptions. The respondent's determination is approved. Fraud The respondent determined that for each of the taxable years 1944 through 1948 the corporation was liable for an addition to tax on account of fraud, pursuant to section 293(b) of the Internal Revenue Code of 1939. [9] He also determined that for each of the years 1944 through 1949 Slater (Slater and his wife for 1948) was liable for an addition to tax under section 293(b) of the Code. Upon this issue the burden of proof is upon the respondent. Section 1112 of the Code. Fraud is never presumed, *167 but must be shown by clear and convincing proof. Rogers v. Commissioner, ( C.A. 6) 111 F. 2d 987, affirming 38 B.T.A. 16; Archer v. Commissioner, ( C.A. 5) 227 F. 2d 270, affirming a Memorandum Opinion of this Court; Kurnick v. Commissioner, ( C.A. 6) 232 F. 2d 678, affirming a Memorandum Opinion of this Court; Shaw v. Commissioner, ( C.A. 6) 252 F. 2d 681, affirming 27 T.C. 561; Arlette Coat Co., 14 T.C. 751; and Frank Imburgia, 22 T.C. 1002. We have concluded and have found as a fact that for each of the years in controversy some part of the deficiency in the case of both the corporation and the individuals was due to fraud with intent to evade tax. In so concluding we have not relied to any extent upon the presumption in favor of the correctness of the respondent's determination of deficiencies in tax. Rather, our conclusions are based upon affirmative evidence which clearly and convincingly establishes fraud with intent to evade tax. The corporation made many expenditures to or on behalf of Slater or his family, which it deducted as corporate business expenses. Among *168 these items were amounts paid for doctor, nurse and hospital bills, amounts for taxes on, repairs to, and utility costs of Slater's personal residence, life insurance premiums, clothing and jewelry, and food and cigarettes. All of these have been set forth in considerable detail in the Findings of Fact. In some instances these expenditures were charged directly to corporate expense, at the direction of Slater, while in other instances they had first been charged by Dean to Slater's personal account but were later, at the direction of Slater, reversed and treated as corporate expenses. It has been stipulated that items of this character were so deducted by the corporation for the years 1944 through 1948 in the respective amounts of $4,003.76, $3,000.94, $1,240.79, $5,994.14, and $7,277.78. In addition to these there were other such items established by the evidence. None of these amounts was reported as income by Slater in his returns for the years 1944 through 1948. To us this is clear evidence on the part of both the corporation and Slater of fraud with intent to evade tax. There can be no question that Slater knew these were his personal items. The evidence shows that he deliberately *169 caused them to be charged as corporate expenses. Slater, in his deposition, attempted to lay the blame for the filing of fraudulent corporate and personal returns on Dean, who physically prepared such returns. However, the evidence shows that Slater signed the returns and consulted with Dean with respect thereto, and that with respect to his personal returns he furnished material to Dean. Indeed, the testimony of both Dean and Bevil, the secretary, was to the effect that Slater was in full charge of the business and financial affairs of the corporation and that he supervised in detail its business, finances, and bookkeeping. Furthermore, although Dean prepared the corporate checks, Slater signed about 90 percent of them. The only checks which he permitted to be signed by others were the payroll checks. Slater was an educated and experienced businessman and we think there can be no doubt that he was aware of the fact that the corporation's returns were false in claiming these deductions and that his personal returns were false in that they did not include these amounts as dividends to the extent there were corporate earnings and profits available for the payment of taxable dividends. *170 The corporation paid or credited to Slater in the years 1944, 1945, and 1946 the respective amounts of $1,451.76, $3,275, and $3,000 purportedly for the use of automobiles, and deducted these amounts. The evidence clearly shows that the automobiles which were used were already owned by the corporation. We think there can be no doubt that these amounts were knowingly deducted with intent to evade corporate tax. Furthermore, Slater did not report any of these amounts in his income tax returns as income. We think this is evidence of an intent on the part of Slater to evade his proper taxes. On December 31, 1946, the corporation credited to Slater's personal account an amount of $21,191.93 ostensibly as cost of surplus materials bought by it from Slater. It deducted this amount as part of cost of goods sold. The evidence is absolutely clear that Slater did not own these materials. He so admitted in his deposition. The corporation had purchased and paid for these materials and had already deducted the cost in computing its cost of goods sold. There can be no question that Slater knew all about this transaction since he handled it for the corporation. The fact that he prepared an invoice *171 and caused the corporation to credit him with this amount and to take a deduction on account thereof, is clear and convincing evidence of his intent to evade the proper corporate tax. Furthermore, his failure to report this amount as income in his own return is evidence of his intent to evade his own taxes. Slater testified that he did not get any money for the property. However, the amount of $21,191.93 was placed to his credit in his personal account and apparently he was free to draw upon it to the same extent that he could draw upon the account for his salary which was also credited thereto. The evidence shows that this amount remained as a credit and in the following year had the effect of offsetting debits to his account. On December 31, 1947, the corporation credited Slater's personal account with an amount of $3,587.25, thereby offsetting the debit balance in his account. It deducted this same amount as a cost of goods sold, and Slater failed to report this amount in his return. We think this is evidence of an intent on the part of both Slater and the corporation to evade their proper taxes. As affirmatively shown by the evidence, there were omitted from corporate income *172 for the years 1944 through 1947 proceeds of sales in the respective amounts of $617.09, $487, $1,375, and $3,200. (The net understatement of sales by the corporation for 1946 was $590.45.) The evidence also affirmatively shows that all these omitted proceeds of sale were appropriated by Slater to his own use. These amounts clearly constituted dividends to Slater to the extent there were earnings and profits of the corporation available. We think it clear that these omissions from the corporation's income and from Slater's returns evidence an intent on the part of both the corporation and Slater to evade their proper taxes. In 1947 the corporation sold an automobile for a net selling price of $1,400. The check in payment for the automobile was made out to Slater and he deposited it in his personal account. Neither he nor the corporation reported any income from this transaction. The corporation had in 1943 deducted the purchase price of this automobile, $1,681.45. As stated hereinabove, we think the respondent properly treated this amount of $1,400 as an unreported long-term capital gain of the automobile and as a distribution from the corporation to Slater, taxable as a dividend *173 to the extent of available earnings and profits of the corporation. We think the failure by Slater and the corporation to report any income on account of this item is evidence of an intent to evade tax. In his returns for the years 1945 through 1949 Slater omitted net rental which he admittedly had received in the respective amounts of $2,667.90, $3,955.66, $5,742.34, $6,638.71, and $884.55. The rental proceeds had been deposited in an account known as the "F & F Co." account which Slater maintained and against which he alone had the authority to draw checks. In making out Slater's individual returns for the various years, Dean advised Slater that these amounts should be included in income, but Slater directed him not to report it. Slater directed Dean not to discuss this account with the revenue agent. Clearly Slater omitted this rental from his returns with intent to evade tax. Slater in 1944 sold certain property and admittedly had a long-term capital gain of $4,079.56, one-half of which, or $2,039.78, was subject to tax. Slater could give no satisfactory reason for having omitted this gain. We think this is evidence of an intent to evade tax for that year. In 1944 Slater *174 received dividends from a number of well known corporations in the aggregate amount of $1,016, which he failed to report. In the years 1944 and 1948 Slater did not report any interest received, whereas he admittedly had received interest in those years from United States Bonds and his savings account in the respective amounts of $278.83 and $324.24. He could not satisfactorily explain any of these omissions. We think these omissions are evidence of an intent to evade his taxes. Slater was convicted in the United States District Court for the Middle District of Tennessee for violation of section 145(b) of the Internal Revenue Code of 1939 in willfully attempting to defeat and evade Federal income tax for the calendar years 1947 and 1948. Their brief in the instant case would seem to indicate that the petitioners have abandoned the contention that the respondent erred in determining additions to tax on account of fraud in the case of Slater for the years 1947 and 1948. However, since it is not entirely clear that such issue was conceded for those years, we have considered the matter and have found that a part of the deficiency in Slater's case for each of those years was due to fraud *175 with intent to evade tax. In this connection the respondent contends that because of Slater's conviction in the district court for those years the doctrine of collateral estoppel precludes the denial in the instant case of liability for additions to tax on account of fraud for those years. We have held that taxpayers are not collaterally estopped under such circumstances. Eugene Vassallo, 23 T.C. 656, and Meyer J. Safra, 30 T.C. 1026. However, such conviction is an evidentiary factor of some significance and we have taken it into consideration, along with all the other evidence of fraud, in reaching our conclusion that Slater was guilty of fraud for the years in question. Eugene Vassallo, supra; Abraham Galant, 26 T.C. 354; and Madeline V. Smith, 32 T.C. 985. We accordingly approve the respondent's determinations of additions to tax, the amounts thereof, however, to be computed under Rule 50. It should be pointed out that for the taxable year 1947 any addition to tax for which the corporation is liable is to be computed upon any deficiency existing before application of a net loss carryback from the year 1949. *176 P.C. and Ethel Petterson, 19 T.C. 486. Statute of Limitations The facts upon which we have based our conclusion that some part of the deficiencies for the years 1944 and 1945, in the case of both Slater and the corporation, was due to fraud with intent to evade tax, lead us to the conclusion that the corporation's returns and Slater's returns for those years were false and fraudulent with intent to evade tax within the meaning of section 276(a) of the Code. Accordingly, the statute of limitations does not bar assessment and collection of any deficiencies which are due for those years. Decisions will be entered under Rule 50. Footnotes
*. All statutory references are to the Internal Revenue Code of 1939. ↩
**. The figure $929.89 is an overassessment for 1947 which arose because of a net operating loss carryback from 1949. The addition to tax under section 293(b)↩ was based upon a deficiency computed before application of the carryback.
*. Items not raised by the petition or conceded by the corporation (at the trial, by stipulation, or on brief) after being raised. ↩
**. Includes items of both Slater and his wife, since a joint return was filed for 1948.↩
*. Items not raised by the petition or conceded by the petitioners (at the trial, by stipulation, or on brief) after being raised.↩
1. This credit entry of $934.95 and another credit as of the year-end contributed toward a credit balance of $1,930.60 in Slater's personal account as of December 31, 1945. This credit balance was transferred as of December 31, 1945, to the corporation's account "WF Slater Loan Account," thereby increasing the amount shown on the corporate books as owing to Slater.↩
2. On brief the petitioners also admit that these amounts constituted taxable dividends to Slater to the extent of available earnings and profits.↩
3. The approximate amounts deposited by Slater in his accounts at Union Planters Bank & Trust Co. and the First National Bank of Memphis during each of the years 1944 through 1949 were, respectively, as follows: $31,000, $11,000, $36,000, $43,000, $26,000, and $35,000. In 1947 Slater made a deposit of $1,500 in his investment account at Merrill, Lynch, Pierce, Fenner & Beane. In 1948 Mrs. Slater deposited about $1,720 in her account at the Union Planters National Bank & Trust Co.↩
4. It appears that the respondent made a mathematical error of $1. One-fourth of the net proceeds of $19,583 is $4,895.75. However it is de minimus. Neither party makes any point of it, nor shall we.↩
5. Although at the trial the original counsel for the petitioners stated in his opening remarks that this issue was conceded, the successor counsel on brief requested that this Court pass upon the correctness of the respondent's determination. In his reply brief respondent in effect agrees this issue should not be treated as conceded by petitioners.↩
6. As shown in the Findings of Fact the petitioners had made representations that physical inventories had been taken during 1948 which showed an excess of actual inventory over book inventory.↩
7. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. * * *↩
8. Section 115(a) of the Code provides in part as follows: (a) Definition of Dividend. - The term "dividend" * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * * (b) Source of Distributions. - For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *↩
9. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2)↩.